IN RE the MARRIAGE OF: James E. LONG,
Petitioner-Respondent,

v.

Kathleen A. LONG, Respondent-Appellant-
Petitioner.

Supreme Court

*No. 84–1667. Argued September 30, 1985.—Decided February 11, 1986.*

(Also reported in 381 N.W.2d 350.)

For the respondent-appellant-petitioner there were briefs by *William J. Campbell* and *Law Offices of William J. Campbell,* Menomonee Falls, and oral argument by *Mr. Campbell.*

For the petitioner-respondent there was a brief by *George N. Kotsonis, William E. Ryan* and *Law Offices of Chronus and Kotsonis,* Milwaukee, and oral argument by *Mr. Ryan.*

SHIRLEY S. ABRAHAMSON, J. This is a review of an unpublished decision of the court of appeals filed March 7, 1985, summarily affirming an order of the circuit court for Washington county, J. Tom Merriam, circuit judge. The circuit court denied Kathleen Long, the custodial parent, permission to remove the parties' two minor children from the State of Wisconsin. Because we conclude that the circuit court abused its discretion by erroneously interpreting sec. 767.245(6), Stats. 1983–84, the removal statute, we vacate the order of the circuit court. We reverse the decision of the court of appeals and remand the case to the circuit court with directions to enter an order granting Kathleen Long permission to remove the children from the state and modifying the visitation arrangement as necessary.[1]

This removal case stems from the divorce of Kathleen Long and James Long. The divorce judgment effective as of December 19, 1983, awarded Kathleen Long custody of the parties' two minor sons and granted James Long reasonable rights of visitation. At the time of the divorce, both parties lived in Washington county.

In February 1984, Kathleen Long filed a motion seeking permission to remove the two children from Washington county to Peoria, Illinois, and requesting modification of the visitation arrangement. In an affidavit to support her motion, Kathleen Long stated that she had been laid off permanently from her Wisconsin job on January 6,

---

[1] Although not relevant to the appeal, it appears that the mother and children lawfully moved to Peoria while the appeal has been pending. The parties apparently agreed to the removal and to alternative visitation for James Long pending appeal. In an affidavit to the court of appeals in a related matter, Kathleen Long's attorney provided evidence that the sons were spending their summer, vacation periods, and two weekends per month with their father and that the parties were sharing the transportation costs of the children's visits by meeting halfway, in Rockford, Illinois, and by suspending support payments during the summer visitation. We do not know, however, if these arrangements are the present visitation arrangements.

1984, that she was unemployed, that she believed she could get a job near Peoria, and that she would "do all in her power to see that the children continue[d] a good and building relationship with their father." James Long filed a motion objecting to the removal of the children from the state because it would decrease his visitation with the children, thereby frustrating his ability to help raise and nurture his children.[2] James Long also requested the court to transfer custody of the children to him.

The circuit court heard both motions on June 22, 1984. It denied the motion to change custody, concluding that James Long had not met the test for a change of custody as set out in *Gould v. Gould,* 116 Wis. 2d 493, 500, 342 N.W.2d 426 (1984). James Long did not appeal the circuit court's custody decision. In a memorandum decision dated June 28, 1984, and an order dated July 30, 1984, the circuit court also denied Kathleen Long's motion for permission to remove the children. The circuit court stated that the burden was on Kathleen Long "to satisfy the Court that the children's best interests would not be impaired by their removal from the State under the circumstance[s] in this case." In deciding the case the circuit court "concluded that the removal from the State . . . is not in the best interest of the children and that that interest must take priority over their mother's reasons supporting her request. . . ."

Kathleen Long appealed the order, arguing that the circuit court had applied the wrong legal standard. The

[2] In an affidavit to support his motion, James Long stated that Kathleen Long had interfered with his visitation rights on several occasions. There appear to be two occasions when the parties disagreed on visitation rights. On one occasion there was a disagreement over who would have the children on one of the son's birthdays. On the other occasion there was a disagreement about the children's whereabouts when Kathleen Long and the children became snowed in while visiting in Illinois.

court of appeals summarily affirmed the circuit court's order, holding that the circuit court "correctly stated that Kathleen [Long] had to demonstrate that the best interests of the children would not be impaired by their removal from Wisconsin." The court of appeals then concluded that the circuit court's determination that the children's removal was inconsistent with their best interests was a reasonable exercise of its discretion.

■

A removal determination, like a custody determination, is committed to the sound discretion of the circuit court. Discretionary determinations do not, however, lie beyond meaningful appellate scrutiny. An appellate court will find an abuse of discretion when, for example, the circuit court exercises its discretion on the basis of an error of law. *Gould v. Gould, supra,* 116 Wis. 2d at 497–98.

■

The issue in this case is whether the circuit court erred in its interpretation of sec. 767.245 (6), Stats. 1983–84, the statute governing removal in this case.[3] Questions of statutory interpretation are questions of law, and this court need not defer to the circuit court's interpretation of the statute.

Section 767.245 (6), Stats. 1983–84, requires the custodial parent to notify the parent having visitation rights of the custodial parent's intention to establish legal residence outside the state. If the parent having visitation rights objects, the circuit court may deny the custodial

---

[3] Section 767.245(6) was amended effective May 18, 1984. Although the amendment was not in effect when the divorce judgment was entered or when Kathleen Long filed her motion to remove on February 15, 1984, it was in effect when the circuit court held its hearing on June 22, 1984, and issued its decision. James Long's brief cited the 1984 statute as the governing law, and the parties agreed on review, and we so hold, that the 1984 amended statute governs this case.

parent permission to remove if it finds that the proposed removal is against the best interests of the child. Sec. 767.245(6), Stats. 1983–84, provides as follows:

> "Whenever the court grants visitation rights to a parent, it shall order the child's custodian to provide to the parent having visitation rights 60 days' notice of the custodian's intention to establish legal residence outside this state or to remove the child from this state for a period of time exceeding 90 days. *Upon motion by the parent having visitation rights and a finding by the court that it is against the best interests of the child for the custodian to so remove the child from this state, the court may deny permission to the custodian.* Violation of a court order under this subsection may be deemed a change of circumstances under s.767.32, allowing the court to modify the judgment with respect to custody, child support and visitation rights so as to permit withholding of a portion of the support payments to defray the added expense to the parent with visitation rights of exercising such rights or to modify a custody order." (Emphasis added.)

Without citing any statutory authority, the circuit court concluded that the burden of persuasion was on Kathleen Long "to satisfy the Court that the children's best interests would not be impaired by their removal from the State under the circumstance[s] in this case."

In requiring Kathleen Long to meet this burden of persuasion,[4] the circuit court appears to have applied the

---

[4] The 1984 statute does not explicitly impose a burden of persuasion on either of the parents. The general rule is that a party using the judicial process to advance a position carries the burden of persuading the court. *Loeb v. Board of Regents,* 29 Wis. 2d 159, 164, 138 N.W.2d 227 (1965). Accordingly, the burden of persuasion would be on the non-custodial parent as the moving party seeking judicial intervention.

The Minnesota Supreme Court in interpreting its removal statute adopted a presumption in favor of removal and imposed the burden of

527

pre-1984 version of sec. 767.245(6). The pre-1984 version of sec. 767.245(6) required the custodial parent to obtain either court approval for removal or the written permission of the parent with visitation rights. Section 767.245(6), Stats. 1981–82, which was enacted in 1977, provided as follows:

> "Whenever the court grants visitation rights to a parent, it shall order the child's custodian to obtain written approval of the parent having visitation rights or permission of the court in order to establish legal residence outside this state or to remove the child from this state for a period of time exceeding 90 days. Such court permission may be granted only after notice to the parent having visitation rights and after opportunity for hearing. Violation of a court order under this subsection may be deemed a change of circumstances under s. 767.32, allowing the court to modify the judgment with respect to custody, child support and visitation rights so as to permit withholding of a portion of the support payments to defray the added expense to the parent with visitation rights of exercising such rights or to modify a custody order."

The 1984 statute differs from the earlier version in two important respects: (1) under the 1984 statute, the *objecting* parent must petition the court to obtain an order denying removal, and (2) under the 1984 statute, upon a petition from the objecting parent the circuit court, in order to deny permission to remove, must make a "finding . . . that [removal] is against the best interests of the child. . . ." Under the earlier version the *custodial* parent had to seek the court's permission for removal if the non-custodial parent did not give written approval. Moreover, the earlier version set forth no test for the circuit court's use in deciding whether to grant permission to remove.

---

persuasion on the noncustodial parent. *Auge v. Auge,* 334 N.W.2d 393, 399 (Minn. 1983).

In affirming the circuit court's test for denying permission to remove, the court of appeals did not refer to either version of sec. 767.245(6) but relied on *Fritschler v. Fritschler,* 60 Wis. 2d 283, 208 N.W.2d 336 (1973), which in turn relied on *Peterson v. Peterson,* 13 Wis. 2d 26, 108 N.W.2d 126 (1961), and *Whitman v. Whitman,* 28 Wis. 2d 50, 135 N.W.2d 835 (1965). This court decided these three cases before the legislature adopted a statute specifically governing removal.

In *Peterson,* the custodial parent petitioned the trial court to remove the child from the state. The trial court granted permission. In affirming the trial court's order, this court adopted what it believed to be the test adopted by a majority of the courts considering this issue: If the custodial parent has good reason for moving to another state and such course of action is consistent with the welfare of the child, the court will permit the removal. *Peterson v. Peterson, supra,* 13 Wis. 2d at 28.

In *Whitman* also, the custodial parent petitioned the trial court for removal. This court affirmed the trial court's order granting permission and justified removal for these reasons: "the [custodial mother's] desire to move was for a proper purpose and [was] beneficial to her, . . . [the proposed removal] was not detrimental to the children, and . . . under the circumstances removal . . . would not constitute an undue burden upon the [father] in exercising his visitation rights." *Whitman v. Whitman, supra,* 28 Wis. 2d at 59. Dissenting in *Whitman,* Justice Hallows advocated a different test: A custodial parent seeking to remove a child should have the "burden of proof . . . to show the well-being of the children will be better served by the removal of the children. . . ." *Id.* at 62 (Hallows, J., dissenting).

In the *Fritschler* case, a custodial mother petitioned the trial court to remove the children from the state, but this time the trial court denied the petition. This court

affirmed. Writing for the majority, Justice Hallows interpreted the *Peterson* and *Whitman* cases as adopting the following test: Removal is permitted if it promotes or at least is consistent with the best interests of the child. *Fritschler v. Fritschler, supra,* 60 Wis. 2d at 288, 290. The court found that removal would disrupt visitation and that the best interests of the children would be served by their remaining in Wisconsin. The trial court and this court apparently considered the father's visitation rights as the most significant factor. *Id.* at 289–90. Both courts ignored the impact of the custodial mother's well-being on the children and refused to consider alternative visitation arrangements.

In *Fritschler,* this court concluded that the trial court had not abused its discretion by refusing to grant the mother permission to move the children to a state in which she might have had a more promising future. It rejected the argument that a better life for the custodial mother would indirectly benefit the children but nevertheless accepted the rationale of a prior case that what was good for the custodial father's finances and career would indirectly benefit the children. *Id.* at 287–89.

*Fritschler* is not good authority for interpreting the 1984 statute. As Justices Robert Hansen and Horace Wilkie recognized in their dissent in *Fritschler,* undue weight was given by the trial court to the professional status and income of the lawyer-father and insufficient weight to the needs, interests, and job opportunities of the homemaker-mother. *Id.* at 292–93 (Hansen, J., dissenting).

Furthermore, when the court decided *Peterson, Whitman* and *Fritschler,* no statute expressly governed removal. In *Peterson,* this court concluded that the same considerations which determine custody of children apply to the question of removal. *Peterson v. Peterson, supra,* 13 Wis. 2d at 28. In *Whitman,* the court applied the statute relating to revision of the divorce judgment to the ques-

tion of removal. *Whitman v. Whitman, supra,* 28 Wis. 2d at 56. *Fritschler* relied on these two cases rather than any statute.

The custodial mother in *Fritschler* urged the court to hold that "a divorced parent having custody should be able to take the children permanently to another state if it is not *against* their best interests." *Fritschler v. Fritschler, supra,* 60 Wis. 2d at 288. (Emphasis added.) The *Fritschler* court rejected this test, the very test the legislature subsequently adopted in the 1984 version of sec. 767.245(6).

We conclude that the *Fritschler, Whitman* and *Peterson* cases are not helpful in interpreting the 1984 statute, because the 1984 statute changed prior law. By requiring the noncustodial parent instead of the custodial parent to seek a court order and by imposing the "against the best interests of the child" test rather than the tests set forth in *Peterson, Whitman,* and *Fritschler,* the legislature has limited judicial intervention in the custodial parent's decision to leave the state. The legislature has recognized the custodial parent's caretaking and family decision-making responsibilities[5] and has made it easier for the

---

[5] This court has said that "[c]ustody embraces the sum of parental rights with respect to the rearing of a child, including its care." *Patrick v. Patrick,* 17 Wis. 2d 434, 437, 117 N.W.2d 256 (1962), quoting *Burge v. City & County of San Francisco,* 41 Cal. 2d 608, 617, 262 P.2d 6, 12 (1953). A child looks to the custodial parent for guidance, discipline, the necessities of life and parental comfort in a stable, settled atmosphere. The custodial parent provides the day-to-day routine of the child, the quality of life, and the general style of life. The noncustodial parent and child do not live together as a single family unit. *Westrate v. Westrate,* 124 Wis. 2d 244, 248, 369 N.W.2d 165 (Ct. App. 1985).

The statutes provide that an "award of legal custody of a child" confers on the legal custodian "the right and duty to protect, train and discipline the child, and to provide food, shelter, legal services, education and ordinary medical and dental care, subject to . . . any existing pa-

custodial parent to remove the children from the state.[6] The legislature has apparently determined that a custodial parent should not be compelled to live in this state to retain custody of the child. Because removal may offer emotional and financial advantages to the custodial parent, removal may also foster the well-being of the child, for the interests of the child and the custodial parent, the primary caretaker, are intricately connected.

This legislative recognition of the custodial parent's responsibilities and powers and of the connection between the child and the custodial parent does not ignore the noncustodial parent. A child's relationship with the noncustodial parent has an important bearing on the child's best interests.

The purpose of the removal statute is to sustain a relationship between the child and the noncustodial parent by protecting reasonable visitation rights.[7] The removal

---

rental rights and responsibilities and the provisions of any court order." Sections 767.24(1)(d), 48.02(12), Stats. 1983–84.

Limiting judicial intervention in post-divorce family decision making is supported by a growing body of social science findings. *See, e.g.,* Wexler, *Rethinking the Modification of Child Custody Decrees,* 94 Yale L.J. 757, 760, 784–803 (1985).

[6] In the past, one of the reasons courts were reluctant to permit out-of-state removal was the fear of losing jurisdiction. *Auge v. Auge,* 334 N.W.2d 393, 399 (Minn. 1983). All fifty states and the District of Columbia, however, have provided jurisdictional protection of child custody decrees by adopting the Uniform Child Custody Jurisdiction Act. Unif. Child Custody Jurisdiction Act, 9 U.L.A. 22–23 (Supp. 1985). *See, e.g.,* Ch. 822, Stats. 1983–84. Federal law provides additional jurisdictional protection under the Parental Kidnaping Prevention Act of 1980, 28 U.S.C. § 1738 A (1982). For a discussion of these acts, see Note, *Residence Restrictions on Custodial Parents: Implications for the Right to Travel,* 12 Rutgers L.J. 341, 353–57 (1981).

[7] Section 767.245(6) is part of sec. 767.245 governing visitation rights.

statute, however, is not designed to burden unduly the custodial parent or to impede his or her decision-making authority as the primary caretaker. Visitation is a flexible arrangement that the parents and the court can modify as circumstances require without undermining the relationship of the child and the noncustodial parent. Section 767.245(2), Stats. 1983–84. Visitation arrangements depend on circumstances, such as the proximity of the child's residence to that of the noncustodial parent and the needs of the child. In short, visitation arrangements reflect a variety of approaches to encouraging a relationship between the child and the noncustodial parent—they do not reflect the existence of a noncustodial parent's inviolate right to any particular arrangement.

The statutory standard for removal of the child outside the state—whether removal is "against the best interests of the child"—must be interpreted in the context of the statutory standards for modification of visitation and change of custody.

If the circuit court grants permission to remove, the custodial or noncustodial parent may request modification of visitation because the existing visitation arrangement may no longer be suitable for a parent or the child. The court may, under the statutes, modify visitation when modification "serves the best interest of the child." Section 767.245(2), Stats. 1983–84.

The question of removal may cause the parents and the court to face the question of a change of custody. If the circuit court grants permission to remove, the noncustodial parent may seek a change of custody. If the circuit court denies permission to remove, the custodial parent may nevertheless wish to leave the state and yet retain custody of the child. To order a change of custody the circuit court must, under the statutes, find that a change of custody is "necessary to the child's best interest." Section

767.32(2), Stats. 1983–84. This court has said that the word "necessary" in sec. 767.32(2) implies that the change of custody itself is needed because the custodial conditions are harmful in some way to the best interests of the child. *Millikin v. Millikin,* 115 Wis. 2d 16, 23, 339 N.W.2d 573 (1983); *Gould v. Gould,* 116 Wis. 2d 493, 500, 342 N.W.2d 426 (1984). The removal statute, sec. 767.245(6), provides that a violation of an order not to remove is not per se grounds for change of custody; it is a circumstance for the circuit court to consider.

Furthermore, in interpreting the statutes this court has held that the trial "court has no power to order where a custodial parent should live within the state" and that a noncustodial parent cannot seek a change of custody merely because the custodial parent's move within the state has made visitation more difficult. *Groh v. Groh,* 110 Wis. 2d 117, 125, 128–130, 327 N.W.2d 655 (1983).

Analyzing sec. 767.245(6) in the context of custody and visitation, we interpret sec. 767.245(6) as requiring the circuit court to recognize, in making its determination on removal, that the custodial parent has the power and responsibility to make decisions for the family unit, that the custodial parent's well-being affects the children's well-being, and that the circuit court has broad latitude in fashioning and modifying visitation arrangements and has limited latitude in changing custody. We conclude that a finding under sec. 767.245(6), Stats. 1983–84, that an out-of-state move will be against the child's best interests must rest on more than a determination that removal will in some way change the visitation arrangements or change the child's relationship with the noncustodial parent. We conclude that a finding under sec. 767.245(6), Stats. 1983–84, that an out-of-state move will be against the child's best interests requires a finding that removal and alternative visitation arrangements will significantly harm

or impede the child's relationship with the noncustodial parent and that this harm to the relationship will work to the child's detriment. If the custodial parent's primary purpose for the removal is to defeat or impede visitation, the removal is against the best interests of the child.

A determination under sec. 767.245(6) that removal is against the best interests of the child is limited to one issue: would removal with a change in visitation significantly harm the relationship between the child and the noncustodial parent and thus adversely affect the child. If the noncustodial parent opposes removal in the belief that removal would adversely affect the health, education, or welfare of the child—aside from or in addition to the adverse effect on the child resulting from a change in the visitation arrangement and significant harm to the child's relationship with the noncustodial parent—then the noncustodial parent should seek a change of custody on the grounds that the custodial conditions in the other state are harmful to the best interests of the child. *Millikin v. Millikin,* 115 Wis. 2d 16, 23, 339 N.W.2d 573 (1983).

The circuit court in this case erred by failing to apply the test required by the 1984 statute, namely, whether removal is against the best interests of the children. The circuit court acknowledged that this was a close case and "concluded that the removal from the State . . . is not in the best interest of the children and that that interest must take priority over their mother's reasons supporting her request. . . ." The circuit court noted that the sons had a close relationship with their father, who frequently exercised his visitation rights. The circuit court found that the removal would not be psychologically damaging to the children, but that removal "would be damaging to the normal parent-child relationship." The circuit court

535

based its finding solely on the disruption of the existing visitation of the children with their father. The court did not approach the case recognizing that the mother as custodial parent has the power and responsibility to make decisions for that family unit, that her well-being affected the children's well-being, and that it must consider alternative visitation arrangements. Because the circuit court's denial of removal was based solely on the disruption of the existing visitation arrangement, the court's finding of damage to the normal parent-child relationship is not equivalent to a finding that the removal is against the best interests of the children. Indeed, as we explained above, the circuit court found that the removal would not be psychologically damaging to the children.

We are sensitive to the need for these children to maintain their relationship with their father, but retaining the father's weekly visitation should not have been the sole factor on which the circuit court determined the removal to be against the children's best interests. Before denying removal the circuit court should have considered the testimony presented about possible alternative visitation arrangements and their effect on the children.

We decline to remand this case to the circuit court to determine whether removal would be against the best interests of the children. The parties had a full opportunity to put in their evidence relating to removal and the best interests of the children. The witnesses discussed alternative visiting arrangements, the effect of the removal on the children's relationship with their father, and the effect of the children's relationship with their father on the children's well-being. We have read the record, and we conclude, as a matter of law, that there is no evidence in this record to support a finding that removal is against the best interests of the children.

In support of her motion for permission to remove the children, Kathleen Long testified that the parties had lived in Peoria from 1977 to 1981, that she wanted to return to Peoria because she had friends and the possibility of a job there and because she thought it was less expensive to live in Peoria than in Washington county. Peoria is approximately 250 miles from Washington county.

Kathleen Long called an expert witness, a psychologist.[8] He testified that the move would not "necessarily have a significantly negative impact on the children." He further testified that if the mother removed the children from the state, the children would be able to retain a full, complete, and loving relationship with their father. In the psychologist's opinion, the divorce itself had created the primary hardship on the children. Although a move would require the children to make a temporary readjustment, he believed that the place of residence was not as significant to these children, who were two and four years old, as the continuity of the primary child caretaker. The psychologist testified that a father's role in the children's developing lives is not entirely dependent upon the frequency of visitation and that, in his opinion, the removal of the Long children to Peoria would not be harmful to the children's best interests.

In opposing the removal motion, James Long testified that the removal of the children would make it financially impossible for him to maintain the same kind of relationship he had when the children lived in Washington county, namely, a relationship that had developed from weekly visitation. He also presented the testimony of a social worker who stated that removing the children and altering the visitation from weekly visits to less frequent, extended visits would make it difficult for the father to

---

[8] The parties agreed to retain and share the expenses of one expert witness. They did not agree, however, to rely on the expert's testimony.

maintain his parental relationship with his sons. But even the social worker testified that the change in visitation arrangements would not be harmful to the children.

The only issue in this case is whether a change in visitation arrangements and the possible change in the father-child relationship is against the best interests of the children. It is evident from the record that there are reasonable visitation alternatives—namely, less frequent but more extended visits—which will preserve the children's relationship with their father. There is no evidence in the record to support a finding that removal and alternative visitation arrangements will significantly harm or impede the relationship between the children and their father. The circuit court found that removal would not be psychologically damaging to the children. Accordingly, we hold that the removal is not against the best interests of the children.[9]

For the reasons set forth, we reverse the decision of the court of appeals and vacate the order of the circuit court. We remand the matter to the circuit court to enter an order granting Kathleen Long permission to remove the children from the state and modifying the visitation arrangement as necessary.

*By the Court.*—The decision of the court of appeals is reversed; the order of the circuit court is vacated; and the cause is remanded to the circuit court.

STEINMETZ, J. *(dissenting)*. I join the dissent of Justice William A. Bablitch and also write separately.

The majority's construction of sec. 767.245(6), Stats. 1983–84, results in two standards for modifying visitation. Modification under subsec. (6), as construed by the majority, permits modification in the event of out-of-state

---

[9] Kathleen Long asserts that the test used by the circuit court in this case violated her constitutional right to travel. In view of our holding in this case we need not consider this issue.

moves unless alternative visitation schemes would significantly *harm* the children's relationship with their father. Section 767.245(2), [1] however, permits modifications of visitation only "whenever modification would serve the best interest of the child." The court's construction of subsec. (6) makes modifications of visitation substantially easier when the custodial parent leaves the state than in situations governed by subsec. (2). I believe that this distinction is irrational and unwarranted. I would construe the statute to permit a modification of visitation, even when the custodial parent desires to leave the state, only when a modification would serve the best interest of the child. I believe the standards in sec. 767.245(2) and (6) are functionally equivalent. Because the circuit court effectively applied the correct standard and the record supports the court's exercise of discretion, I would affirm the court's decision.

The majority concludes that the circuit court erred by applying an improper test for determining whether to permit the custodial parent to move from Wisconsin. The circuit court required the custodial parent to "satisfy the Court that the children's best interests would not be impaired by their removal from the state under the circumstance[s] in this case." The majority construes this test to be the same as that applied in *Fritschler v. Fritschler,* 60 Wis. 2d 283, 288, 208 N.W.2d 336 (1973), in which this court defined the test for permitting out-of-state moves to be:

---

[1] Section 767.245(2), Stats., provides as follows:

**"767.245 Visitation. . . .**

" (2) The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not terminate a parent's visitation rights unless it finds that the visitation would endanger the child's physical, mental or emotional health."

"[T]he majority of cases on this point support the rule that if a parent who has custody of a child has good reason for living in another state, the courts will permit the removal providing such course of conduct is consistent with the best interests of the child."

The majority considers this test to be inapplicable because it is inconsistent with sec. 767.245(6), Stats. 1983–84, which became effective May 18, 1984. That statute permits relocation unless it is against the best interest of the child. The majority does not specifically state how the two tests differ, and I do not believe that there is any practical difference.

First, the majority erroneously construes sec. 767.245(6), Stats., as imposing a burden of persuasion on the noncustodial parent to prove that a move is against the best interests of the children. The majority bases this conclusion on the fact that the noncustodial parent must bring a motion objecting to a proposed move under subsec. (6). The court construes this as making the noncustodial parent the party using the judicial process to advance a position.

In fact, if the noncustodial parent objects, then the custodial parent cannot leave the state without the permission of the court. The custodial parent, therefore, is in the position of needing judicial assistance to advance a change in the status quo. The custodial parent is the one who is disturbing the balance of the original court order of custody and visitation and, thus, the burden of persuasion would rest on the custodial parent under the reasoning of the majority. This is consistent with the allocation of the burden of proof in other modification of visitation cases under sec. 767.245(2), Stats. I do not believe the legislature intended to allocate the burden differently depending only upon whether the modification involved an interstate move. Requiring the noncustodial parent to object to a move is simply a means of giving that person a

choice as to whether to require the custodial parent to justify an out-of-state move and an accompanying modification of visitation.

The majority also errs by construing sec. 767.245(6), Stats., as creating a test that is substantively distinct from the *Fritschler* test. Under *Fritschler,* the custodial parent must prove that an out-of-state move is consistent with the best interests of the children. By contrast, the majority construes sec. 767.245(6) as permitting out-of-state moves unless there is proof that alternative visitation schedules would "harm" the relationship between the child and the noncustodial parent. The majority considers this test to be different than the best interests of the children test.

I cannot subscribe to the view that the legislature intended the phrase "against the best interest of the child" to permit only consideration of whether alternative visitation schedules would be harmful to the parent-child relationship. This interpretation of sec. 767.245(6), Stats., permits the modification of visitation without any overall consideration of the best interests of the children. Because sec. 767.245(2) requires that modifications of visitation in other contexts serve the best interests of the children, the majority's construction of sec. 767.245(6) makes it easier to modify visitation when an out-of-state move is involved than when an in-state modification is sought. I do not believe the legislature intended such an irrational distinction. Instead, I believe that the legislature, by prohibiting moves which are against the best interest of the child, meant to permit only those moves that serve the best interest of the child. In other words, the two standards in secs. 767.245(2) and (6) are functional equivalents. I base this conclusion in part on the rule of statutory construction providing that statutes which are in *pari materia* should be harmonized where possible and not interpreted to indicate a contradictory legislative in-

tent if that can be avoided. *State v. Wachsmuth,* 73 Wis. 2d 318, 325–26, 243 N.W.2d 410 (1976).

The majority recognizes an artificial distinction between the phrase "consistent with the best interest of the child" and the phrase "against the best interest of the child." I believe that in order to be "consistent with the best interest of the child," a proposed modification may not be against such best interest. The majority errs in distinguishing the two phrases because it apparently construes "consistent with the best interest" to mean that a positive improvement of the child's circumstances is required. This court, however, has never conditioned out-of-state moves on such a showing when applying the best interest test. A careful reading of the decisions criticized by the majority, including *Fritschler,* shows that the court balanced the harm caused by disrupting an established visitation schedule against the advantages of the proposed move.

Because I believe that the instability in a child's life caused by changing visitation can be against the best interest of the child, consideration of the advantages of a proposed move is essential in order for such a move ever to be consistent with the best interest of the child. The majority prohibits consideration of the advantages of a move because it apparently believes that changes in visitation do not adversely affect the best interest of the child if alternative visitation is possible. Although I agree that changes in visitation are not as disruptive as changes in custody, *see Bahr v. Galonski,* 80 Wis. 2d 72, 80, 257 N.W.2d 869 (1977), it does not follow that changes in visitation are without effect. Such changes can create instability. I believe some consideration is necessary to protect against this instability, and the best interest test serves that purpose. Of course, it is a less rigorous standard than used in the custody transfer context because of the lesser disruption. *See In re Marriage of Millikin v. Millikin,* 115

Wis. 2d 16, 22–23, 339 N.W.2d 573 (1983). It does prevent visitation modification, however, without some counter-vailing advantage.

I am sensitive to the legitimate need for custodial parents to relocate out of state. We live in a society that sometimes requires mobility. However, requiring a custo-dial parent to show that the best interest of a child will be as well served after a move as before does not mean that moves will always be prohibited. The majority fails to note that *Peterson v. Peterson,* 13 Wis. 2d 26, 108 N.W.2d 126 (1961) and *Whitman v. Whitman,* 28 Wis. 2d 50, 135 N.W.2d 835 (1965), cases relied upon in *Fritschler,* both permitted out-of-state moves. The best interest test, therefore does not bar moves, but it does require that a move be for a good reason and not be detrimental to the children. *Whitman,* 28 Wis. 2d at 59. I believe that this is the least we can ask of a custodial parent, and I believe that this is the same test established in secs. 767.245(2) and (6), Stats.

My refusal to adopt the strained reasoning of the ma-jority, which distinguishes between "consistent with the best interest" and "against the best interest," is supported by the irrationality of the distinction. Under the court's construction, it is easier to modify visitation by moving out of state than it is to otherwise modify visitation. The majority offers no logical justification for this result, and indeed, I can think of none. Because the majority's con-struction of sec. 767.245(6) renders the statute irrational and arbitrary, I believe the construction raises constitu-tional questions about the validity of the statute. Thus, the rule of statutory construction that favors interpreting statutes to avoid constitutional infirmities supports my interpretation of secs. 767.245(2) and (6) as establishing functionally equivalent tests for visitation modifications. *See State v. Popanz,* 112 Wis. 2d 166, 172, 332 N.W.2d 750 (1983).

I would affirm the circuit court's decision because the court correctly applied the best interest test and because the court did not abuse its discretion. The court stated the test it applied to be whether the children's best interests would be *impaired.* This test, construed by the majority to be different than the "against the best interest" test, clearly reveals the semantic gymnastics employed by the court to find an error of law. I believe the circuit court applied a correct test. Our review of the court's decision, therefore, is whether the court abused its discretion. I agree with the court of appeals that the record does not establish such an abuse of discretion.

The record does not show any advantage from the move that is not speculative at best. The custodial parent testified that she wanted to move to Peoria because she had friends and the possibility of a job there and because she thought it was less expensive to live in Peoria. These reasons lack any certain benefit to the children. The reasons might be sufficient but for the countervailing instability caused by the need to modify visitation. Moreover, the noncustodial parent testified that the move would make the exercise of equivalent visitation financially impossible. The majority ignores this fact when stating that alternative visitation should be adopted. The disruption in the established visitation schedule, even if alternatives are possible, is itself harmful to the children. The circuit court properly exercised its discretion, therefore, in determining that the speculative justifications for the proposed move did not outweigh the disadvantage caused by the resulting disruption and instability.

The majority exceeds the proper role of this court when it concludes that changes in visitation have no negative effect on children. Implicit in the court's conclusion is the factual finding that all visitation schedules are equivalent. Thus, the court cavalierly directs the circuit court to simply change the visitation schedule. I do not

believe there is any factual basis in this record to support such a proposition. Experts certainly do not agree whether frequent visitation is equivalent to infrequent but longer visitation. I think that such an abstract argument is fruitless and should not be resolved by this court. The best visitation schedule for any divorced family must be determined on a case-by-case basis after considering, among other factors, the nature of the existing relationship between the noncustodial parent and children. Here, the circuit court considered the existing relationship to be important when compared to the speculative reasons for disrupting that relationship. This is a decision that is especially appropriate for the circuit court's discretion. Whether this court would reach the same result in the first instance is not dispositive. The circuit court did not abuse its discretion and its decision should be affirmed.

Although I disagree with the majority's construction of sec. 767.245(6), Stats., I could not join the opinion even if I accepted the court's statutory interpretation. First, I do not believe that the amended statute is applicable to this case because it became effective after commencement of this proceeding. The *custodial* parent commenced this proceeding for permission to move on February 15, 1984, and the statute became effective May 18, 1984. Contrary to the majority's statement that the noncustodial parent initiated this action, the custodial parent actually commenced it. Moreover, because the majority construes sec. 767.245(6) to effect a substantive change in the law, the statute cannot be applied retroactively. *See Gutter v. Seamandel,* 103 Wis. 2d 1, 17–18, 308 N.W.2d 403 (1981). Whatever the proper construction of the statute, therefore, it does not apply to this case. The noncustodial parent's concession in this court that the statute does apply is not legally binding. The majority does not find the new statute applied by legal analysis, but rather, so holds due to the agreement of the parties. Majority opinion n. 3.

545

I also cannot accept the majority's resolution of this case on the merits. The court announces a major change in the applicable law which was never addressed by the parties or the circuit court. Nonetheless, the court makes a factual determination that the proposed move is not against the best interest of the children. This court cannot make factual determinations, especially when the real issue was not tried before the circuit court. Under the majority's reasoning, the court should remand this case to the circuit court for a new hearing and application of the appropriate standard. *See* sec. 751.06, Stats.

In summary, the majority construes sec. 767.245(6), Stats., so as to make it a virtual nullity. The court permits out-of-state moves unless no alternative visitation is possible. This permissive standard would not prevent any move. If all visitation schedules are considered equal, then some minimal alternative will always be possible. The legislature could not have intended to permit such easy modification, especially when modification in other situations must serve the best interest of the child.

I would construe sec. 767.245(6), Stats., to require consideration of whether a proposed move will have an effect on visitation. If there is no effect, then the move should be permitted. On the other hand, if there is an effect on visitation, then the move must be consistent with the best interest of the child. I believe the circuit court applied this test and properly exercised its discretion. I would affirm the decision of the court of appeals and, therefore, also the circuit court.

I am authorized to state that Mr. JUSTICE LOUIS J. CECI joins this dissenting opinion.

BABLITCH, J. (dissenting). Common experience tells us that removing a child from an environment which he or she knows and trusts is generally disruptive, frequently devastatingly so. Equally true is that the new environment which the child enters may be harmful to the

health, education, and welfare of the child. We also understand that changes in the broader environment—changes of school, of friends, of neighborhood, of access to grandparents, aunts, uncles and other important adults—often aggravate the sense of insecurity which children of divorcing parents experience when the parents separate. Nonetheless, the majority today holds that the only factor a court may consider as "against the childs' best interests" in preventing a custodial parent from removing a child to an out of state environment is the impact which removal has on visitation between the noncustodial parent and the child.

The majority's conclusion is a serious step backward in this very critical area of family law. It cannot be justified by its strained interpretation of sec. 767.245(6), Stats. It cannot be justified in light of research regarding the needs of children and families after divorce. Further, its conclusion will, in numerous cases, cause harmful and absurd results. Because I conclude that a court, in determining whether a custodial parent should be allowed to remove a child from this state, must consider all evidence relating to the effect such a move would have on the child's total living environment, I respectfully dissent.

This case involves interpretation of sec. 767.245(6), Stats., which states, in part, that a court may deny a custodial parent permission to remove a child from this state upon ". . . a finding by the court that it is against the best interests of the child for the custodian to so remove the child from this state. . . ." The majority interprets "against the best interests of the child" to mean that a court should consider removal to be against the child's "best interests" only where, under the circumstances, alternative visitation arrangements would significantly harm the relationship between the child and the noncustodial parent. Majority opinion pp. 534–535. In short, the majority holds that in removal cases the only relevant issue

547

is visitation; evidence of disruption and harm to the children, other than as the removal affects visitation, is not relevant and, therefore, not to be considered.

The majority's interpretation is grounded on a basic hypothesis: "The purpose of the removal statute is to sustain a relationship between the child and the noncustodial parent *by protecting reasonable visitation rights.*"[1] Majority opinion p. 532. Although the majority's hypothesis may appear reasonable on its face, to accept it as correct is to be drawn inexorably to the majority's conclusion. I agree that if the sole purpose of this section is to safeguard the right of the noncustodial parent to sustain a relationship with his or her child after divorce through reasonable visitation arrangements, then the only admissible evidence at a hearing to challenge removal of the child must relate to the adequacy of the proposed visitation arrangement. But I don't agree that this is the sole purpose of this section. I challenge the majority's hypothesis and submit that it does not capture the primary purpose of the section. From the context of the entire family code, it is apparent that the primary purpose of the section is to protect the "best interests of the child." When viewed from that perspective, rather than from the perspective of the interests of parents, as the majority opinion does, the majority's conclusion must fall.

Critical to the interpretation of sec. 767.245(6), Stats., is to look at the family code in its entirety. To do so makes clear that in ch. 767 the legislature has, in regard to all questions involving children of divorcing parents, insisted that the analytical framework be a form of "best interests

---

[1] The only authority cited for this claimed purpose is in footnote 7 of the majority's opinion, which states, in its entirety: "Sec. 767.245(6) is part of sec. 767.245 governing visitation rights." Majority opinion n.7. This conclusory statement is hardly a solid foundation upon which to rest a wide sweeping assertion about legislative purpose.

of the child" test, whether the words the legislature used are "against" or "in" the best interest.[2]

In reforming ch. 767, Stats., the legislature introduced into the family code of this state important protection for the interests of the child in continuation of familial and community relationships after divorce. It mandated that courts consider the "best interests of the child" in making both temporary and permanent custody awards, in altering custody, in granting and modifying visitation rights and in property division. *See* secs. 767.23(1n), 767.24, 767.045, 767.32 and 767.255.

Accordingly, sec. 767.245, Stats., did not limit the test for permission to remove a child from the state to the issue of whether an alternative visitation schedule would permit sufficient contact to preserve the existing relationship between the noncustodial parent and the child. Instead, it required the court to determine whether the removal was "against the best interests of the child." In doing so, the legislature recognized, as this court has previously recognized, that visitation privileges, like custodial rights, and many other divorce related decisions, are to promote the best interests of the child. *Marotz v. Marotz,* 80 Wis. 2d 477, 486, 259 N.W.2d 524 (1977).

The majority opinion errs by framing the issue in this case in terms of visitation arrangements *only,* as though the legislature intended that somehow each decision re-

---

[2] The majority seems to argue that because the legislature used the words "against the best interests" in the removal statute rather than the words "in the best interests," the legislature was evincing its intent to limit judicial intervention in the custodial parent's decision to remove the children much more severely than in other post-divorce decisions involving children. There is no support for such an argument in the legislative history of the bill, nor in the words of the statute. I agree with the conclusion of my colleague, Justice Steinmetz, that "against the best interests" is, for the most part, indistinguishable from "in the best interests," in that one is merely the opposite side of the coin from the other.

garding children after divorce be compartmentalized and assessed with near mathematical precision. By analyzing the removal issue in terms of visitation arrangements only, the majority looks at the issue through the wrong end of the telescope, and thereby misses the point. Focusing on the rights of the custodial and the noncustodial parents causes the majority to overlook very important interests of the child.

Regarding the criteria which apply to the determination of custody, which is supplemented by the assignment of visitation rights to the noncustodial parent in most cases, the legislature required courts to consider ". . . all facts in the best interest of the child . . ," including these factors:

" (a) The wishes of the child's parent or parents as to custody;

" (am) The wishes of the child as to his or her custody;

" (b) The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest;

" (c) The child's adjustment to the home, school, religion and community;

" (d) The mental and physical health of the parties, the minor children and other persons living in a proposed custodial household;

" (e) The availability of public or private child care services; and

" (f) Such other factors as the court may in each individual case determine to be relevant." Section 767.24(2), Stats.

Clearly the broad inquiry into the "best interest of the child" at the divorce of the parents mandated by sec. 767.24(2), Stats., requires the court to do much more than assess each parent's relationship with the child. It re-

quires examination of the matrix of social connections which make up the child's world at the divorce of the parents.

Thus, whether the parties stipulate to or litigate custody issues, the final judgment in a divorce in which the parties have minor children embodies an overall plan to promote the welfare of the children after the divorce. The final judgment is the result of the court's review of numerous factors, including relationships of the child with significant people in the child's life; the psychological adjustment of the child to home, school, religion, and community; the mental and physical health of all the parties in the proposed household, and more. In essence, the judgment establishes an overall post-divorce living plan for the child which is based on important needs of the child. Because the plan is an integrated plan, substantial revisions of one element of the plan reverberate through and affect the entire plan. It is self-evident that removal from the original court-approved environment will, in many cases, be a substantial revision of that plan, requiring a review of the full range of the interests of the child which originally shaped it.

I submit that preventing the court from considering the full range of the interests of the child in the context of a removal from the state defeats the legislative purpose in enacting the family code. Reducing the "best interests of the child" standard to consideration only of facts relevant to the visitation between the noncustodial parent and the child eliminates consideration of nearly all of the factors which justified the court's original order.

By making the quality of the relationship with the visiting parent and the potential for alternative visitation arrangements the *only* criteria for denial of permission to remove the child, the majority prevents a court from considering factors that may very well justify denial of permission to remove the child, even though they may not

justify a change in custody. Thus, a court, whose original order was intended to protect the child's interest in contact with the family and other psychologically significant persons, may not consider at a removal hearing the effect of a removal on sibling, step-sibling, grandparent or other relationships, so long as the custodial parent offers an alternative visitation schedule that preserves the relationship between the child and the visiting parent. Similarly, although a court previously determined that custody in one parent represented the child's "best interests" at least in part because of proposed arrangements for child care, schooling, religious training and the like, a court may not consider disruptions or discontinuations of those arrangements, or problems of the proposed new arrangements, at a removal hearing. Such an interpretation of the section permits the custodial parent to disregard legitimate objections of the noncustodial parent to changes in the child's environment merely because the changes are unrelated to the visitation schedule and are not sufficiently harmful to justify a change of custody. In short, the majority's interpretation disregards situations in which a proposed arrangement preserves the visitation pattern but jeopardizes other interests of the child which the parties, as well as the court, ought to protect in fulfillment of their responsibilities to the child.

Under the best of conditions under the principle of shared parenting, divorced parents should make important decisions which affect their children after divorce by taking into account the best interests of the children, as well as their own individual interests. Children's needs change, parents' needs change. However, when parents are unable to cooperate in such decisions, including whether a child should be removed to another state at a particular time, it becomes the responsibility of the court to make the decision in the interests of the child. Accordingly, when it undertakes this responsibility, the court

must have access to all the relevant information regarding the probable impact of the removal on the interest of the child.

Why the legislature chose to allow a court at a removal hearing to focus on the best interests of the child and to consider this wide range of factors is also clear from the historical development of child custody law. Historically, the majority's emphasis would have been appropriate. Until well into the nineteenth century, the law emphasized the rights of the parents, treating children as property of the parents. In early times, the law considered children as the property of the father, who therefore was presumptively the custodial parent. However, as time changed, concepts of the family changed, and child-rearing became associated with the mother; then the law began to recognize a presumptive custody with the mother. *See:* Foster & Freed, *Life With Father: 1978,* 11 Fam. L.Q. 321 (1978); Roth, *The Tender Years Presumption in Child Custody Disputes,* 15 J. Fam. L. 423 (1976); Podell, *Custody-To Which Parent?* 56 Marq. L. Rev. 51 (1972); 1 W. Blackstone, Commentaries on the Laws of England 453 (Lewis ed. 1897); and 70 A.L.R. 3d 262 (1976). *See also In re Marriage of Groh v. Groh,* 110 Wis 2d. 117, 122–23, 327 N.W.2d 655 (1983).

More recently, the concept of shared responsibility of the parenting role has been increasingly recognized. Most states have recognized the need to consider child-related decisions at divorce as part of a process of establishing an overall living plan for the children, rather than as a series of separate decisions about custody, visitation and support. Almost two-thirds of the states now embody the concept of a joint custody in their statutes. *See* 11 Fam. L. Rep. (BNA) 3019 (May 7, 1985) and Folberg, (ed.), *Joint Custody and Shared Parenting* 159–67 (1984). This new focus on the promotion of the well-being of the child encompasses concern for the totality of the child's post-

divorce environment, including physical and emotional well-being, relationships, education, and necessary support. The adoption by the legislature of the new family code, which includes sec. 767.245(6), Stats., reflects this approach.

The legislature, by focusing concern on the well-being of the child and the totality of the child's post-divorce environment, has taken an important step toward integrating insights developed by recent research on the interests of children at divorce into the law. This research demonstrates that the consideration of a broad range of environmental factors, as mandated throughout ch. 767, Stats., safeguards critical needs of the child at this time.

Visitation is, of course, important. Psychological research on the adjustment of children to the divorce of their parents demonstrates that a continuing relationship with both parents is highly desirable; post-divorce arrangements that enable both parents to be responsible for the children and to express their concern for the children on a regular basis spare the children much of the pain and disorientation of a break in what remains an important emotional relationship with each parent. Wallerstein & Kelly, *Surviving the Breakup* 307, 310–11 (1980). In fact, researchers find that ". . . the key variable affecting satisfactory adjustment of children following divorce is the extent of continuing involvement by both parents in child rearing." Folberg & Graham, *Joint Custody of Children Following Divorce,* 12 U.C.D. L. Rev. 523, 535 (1979). (Of course, common sense suggests that, in some situations, depending on the age of the child at divorce as well as the previous involvement of each parent with the child, the child's adjustment will be more affected by factors other than "continuing involvement.")

However, more than visitation is important. Research also indicates that the adjustment of children and parents to divorce is best understood as an adjustment

over a prolonged period. During that period the extent of environmental change which parents and children experience is a key factor in the adjustment of the children; in fact, some researchers have concluded that children's divorce related difficulties, including depression, social withdrawal, and aggression, may stem from the children's perception that they have minimal control over such environmental changes as a new residence. *See* Wexler *Rethinking the Modification of Child Custody Decrees,* 94 Yale L.J. 757, 785, 797 (1985). Of course, the age of the child at divorce, as well as the previous involvement of each parent with the child, will also affect the adjustment of a child in a particular case.

I conclude from this and related research that the legislature had a very solid foundation for emphasizing the interests of the child in a stable, supportive familial and community environment when it reformed the family code in 1977. In order to effectuate the legislative intent to protect this important interest of children, sec. 767.245(6), Stats., must be interpreted so as to preserve the range of factors considered in the award of custody, so that custodial parents and the courts take this range of environmental factors into account when deciding whether a child should be removed from the state.[3] The

---

[3] The majority argues that the ". . . legislature has recognized the custodial parent's caretaking and family decision-making responsibilities . . ." and has therefore chosen to make removal easier. Majority opinion pp. 531, 532. The majority does not cite legislative history to establish this interpretation of the legislative intent behind the removal statute. Instead, it refers to social science research, implying that this research supports making removal by the custodial parent easier. The majority quotes Wexler, cited above, in part: "Limiting judicial intervention in post-divorce family decision making is supported by a growing body of social science findings." Majority opinion n. 5. The Wexler article, however, does not support the majority's argument that restraints on removal are undesirable. To the extent that Wexler discusses the need

majority, unfortunately, ignores all the factors but visitation.

Lastly, the majority's conclusion can lead to very harmful and absurd results. Consider the situation in which there has been protracted battle over custody. Both parents want custody, and the court must decide between the two. Both parents submit plans to the court embodying, we must assume, plans for the children should they get custody, including available educational, health, and welfare opportunities in the environment in which they would place the children. The court, because one or both of the parties decline joint custody, must choose. *See* sec. 767.24(1)(b), Stats. One week, one month or one year after the decision, whatever, the custodial parent decides to leave the state with the children. The majority says that same court, which may well have made its final decision based primarily on the environment in which one of the battling parents told the court he or she would place the child, can only consider visitation with respect to allowing that move. That simply does not make sense.

Or consider the case where one party, for his or her own good reasons, chooses not to be the custodial parent.

---

of children for stability in post-divorce arrangements, his article supports my interpretation of sec. 767.245(6), Stats, as a necesary protection for such stability.

". . . a growing body of social science findings . . . dispute important assumptions routinely made by the courts. These findings strongly suggest that divorce is a process, not a fixed event, and that the custodial parent and child require a period of time to adapt to the new post-divorce situation. Research indicates that courts generally do not appropriately evaluate the various factors that affect the child's adjustment during this process." Wexler at 760.

Further, I submit that for the majority to characterize the unilateral decision of one parent to remove the child from the state as "family decision-making" is inappropriate. "Family decisions" result from thoughtful consideration of the impact of proposed changes on the whole family, whether or not a divorce has occurred.

The majority would force that noncustodial parent into a custody fight he or she does not want, in order to prevent a removal that he or she perceives to be harmful to the health, education or welfare of the children. That is because the majority concludes that if factors other than visitation are implicated in the removal, then the noncustodial parent must seek a change of custody rather than a prohibition against removal. Majority opinion page 535.

Or consider the case where neither parent wants a custody change, but the noncustodial parent does not want the children removed and the custodial parent will not move if it means giving up custody. The majority, notwithstanding, would force this couple into a custody fight.

In sum, I conclude that sec. 767.245(6), Stats., when correctly interpreted, allows the court to consider all evidence relating to the effect a removal from the state will have on the total living environment of the child. If, after consideration of all relevant evidence, the court determines that a move is "against the best interests of the child," it may deny permission to remove the child at that time. Only this interpretation gives effect to the unambiguous intent of the legislature to protect the interests of children at divorce by requiring courts to consider a broad range of factors which affect the adjustment of the child. Recent research which indicates that children and families after divorce need continuity as they go through the long process of adjustment to divorce supports this interpretation. Further, this interpretation protects postdivorce families from the needless disruption of the litigation of custody changes in situations in which the impacts of removal on the child are the real issue.

In addition, I agree with Justice Steinmetz that the majority errs in determining, as a matter of law, that the facts in this case permit removal even under the test it enunciates. The testimony presented to the circuit court

did not directly assess the issue whether alternative visitation arrangements would significantly harm the relationship between the child and the noncustodial parent. Majority opinion pages 534–535. Testifying for the custodial parent, a psychologist compared the harm to the children of a post-divorce change in custody to the harm of a readjustment in scheduling of visitations with the noncustodial parent, concluding that the loss of a primary custodian was the more harmful alternative. A social worker called by the noncustodial parent testified that replacing weekly visits with less frequent but extended visits would cause a more difficult adjustment for the parent than for the children. In short, the record indicates probable harm to the quality of the noncustodial parent's relationship with the children and is silent on the implications of that harm for the interests of the children.[4] On this record, the majority's finding of fact is without support and application of its test (notwithstanding my disagreement with its test) requires remand.

I am authorized to state that JUSTICE DONALD W. STEINMETZ and JUSTICE LOUIS J. CECI join in this dissent.

---

[4] Research indicates that both parents and children experience an abrupt discontinuity in their relationship when they originally adapt to the confines of the "visitation" relationship. Wallerstein & Kelly at 123. The noncustodial parent finds that the new relationship is very fragile and that legal restrictions on the visits exacerbate the difficulties of adjustment; children are dissatisfied with the limits of a visiting relationship, feeling that they see too little of the noncustodial parent. *Id.* at 315, 142. Because expert testimony in this case suggested that a negative impact on the noncustodial parent's adjustment to a restricted visitation schedule was likely, I cannot conclude, as does the majority, that no evidence supports a finding that a change in the visitation arrangement "... would significantly harm or impede the relationship between the children and their father ...." P. 536. Instead, the evidence suggests that the new schedule would create a new disequilibrium in that relationship to which both the parent and the children must adjust.