2001 OK 30

**Toby Kay KAISER, Appellant,**

v.

**Darren Gene KAISER, Appellee.**

**No. 93,761.**

Supreme Court of Oklahoma.

April 3, 2001.

As Corrected May 14, 2001.

Catherine Holland Petersen, Salliann Parker Walker, Petersen Associates, Inc., Norman, OK, and Lauren LeBlanc Day, Oklahoma City, Attorneys for Appellant.

Bill J. English, English & Odom, Norman, OK, Attorneys for Appellee.

SUMMERS, J.

¶1 This is an appeal by a mother and custodial parent of her seven-year-old son, from the trial court's order which denied her permission to move from Oklahoma to a suburb of Washington, D.C. with the boy. She asked the court to modify the existing visitation schedule for father, as changes would be necessitated by her intended employment-related move. The father opposed her move, contending the changes in visitation would be detrimental to their father-son relationship. The trial court denied mother's motion, ruling that the son could not be moved away from his father. Mother declined the job offer and stayed in Oklahoma in order to retain custody. Her appeal presents this Court its first opportunity to directly address issues which have been raging in our sister states in recent years regarding the right of

a custodial parent to relocate. We reverse the trial court's judgment and remand the matter with directions.

## I.

¶ 2 After ten years of marriage Toby and Darren Kaiser, residents of Norman, were divorced in 1994. Mother was awarded custody of two-year-old Warren, and the father was granted standard visitation rights. The record shows that the parties had a difficult post-divorce relationship which resulted in a litigious history. Father unsuccessfully sought to modify Warren's custody, based on her decision to enroll Warren in the first grade at Casady School in Oklahoma City rather than send him back to the school in Norman where he had attended kindergarten. As a consequence of stress in the parents' relationship which was exacerbated by their protracted litigation, the trial court, with the consent of the parents, appointed a counselor for Warren. A guardian ad litem was also appointed to represent his interests in the litigation then pending. The father's motion to modify was resolved by agreement of the parties in April 1999. Under it custody remained with mother, father's visitation time was increased (to 36% of Warren's time), and mother was authorized to move to Oklahoma City with Warren and to keep him enrolled in Casady.

¶ 3 On July 30, 1999 mother filed the motion to modify at issue here. It advised the court that she had recently accepted an employment position as Program Analyst of the International Space Station at the N.A.S.A. Headquarters in Washington, D.C., and because of this intended relocation, father's visitation schedule needed to be modified.

¶ 4 Father responded by filing an objection to mother's move alleging she was attempting to "freeze" him out of Warren's life. He also filed an application seeking to have the court award temporary custody of Warren to him and to establish visitation rights for mother and order her to pay child support.

¶ 5 Trial was had on mother's motion for four partial days. Mother's testimony showed she had been a civilian employee at Tinker Air Force Base for twelve years; her grade was GS–12, step 6, with an annual salary of $55,874. She had been at the same GS–12 grade for nine years, and had been unable to get a promotion beyond that. She testified that it was very unlikely that she would ever advance above that grade at Tinker.

¶ 6 Mother testified that on July 19 she was offered this position which she had accepted, and that her job would be managing the budget for the International Space Station for the Director of NASA. She testified this job was the "opportunity of a lifetime"; it offered significant advancement for her career and many personal advantages because of the increased responsibility, significant increases in income and retirement, and better marketability if she quit or retired from the government. She stated the NASA budget is ten times larger than the one she currently manages, and the job is a GS–13, target 15. That means that she would enter the position as a GS–13 at an annual salary of $61,895, that after one year's service she would receive an automatic promotion to a GS–14 at $68,570, and that after one year at that grade she would be promoted to a GS–15 at $80,658. Mother testified that because Warren was more important to her than any job, she would not move if she could not take him with her.

¶ 7 She stated that she was familiar with the Alexandria, Virginia area and knew that an appropriate apartment would be affordable with her salary; that she had not yet decided whether she would rent or purchase a home, but that NASA would provide her and Warren with two months free temporary housing, as well as all the costs of selling her current home and those of purchasing a new one. Mother testified that the two private schools she was considering for Warren were similar to Casady; one school had already admitted him and offered financial aid, and she could drive Warren to school in ten minutes. She stated that the educational and cultural opportunities which would be available to Warren in the Washington area are unrivaled anywhere in the country, and that the increase in her salary from this position would help her pay for his college.

¶ 8 Mother asked the court to modify father's visitation schedule to facilitate less frequent but longer periods of visitation which would be appropriate to Warren's school schedule and the availability of travel arrangements. She stated that she agreed to Warren visiting his father for eight continuous weeks in the summer, two spring breaks out of every three, a week every Christmas, alternating Thanksgivings, and alternating fall breaks. By extending one long weekend in every month, his father could see Warren on the average of five to six days per school month and his visitation would work out to be 30% of Warren's total time. Mother testified that there were good airline connections between Oklahoma City and Washington D.C., that she and her mother were prepared to fly with Warren, and if Warren flew into Dallas her mother was willing to bring him from there to Oklahoma City. Mother proposed an equal split of transportation costs. She also anticipated furnishing Warren with video conferencing equipment so he and his father could communicate in that way.

¶ 9 An employee of the Inspector General's Office at Tinker testified for mother, and confirmed that GS–12's at Tinker stayed at that grade "forever," and that she could not reasonably expect to be promoted there. He himself was a GS–12 and had been one for ten years. He also testified that there is no such thing as a GS–13, target 15, job at Tinker.

¶ 10 The psychologist who had been asked by the court in 1998 to monitor Warren's adjustment during the continuing litigation between his parents, testified as a witness for mother that he had met with Warren sixteen or seventeen times, and had visited with mother briefly almost as many times. He testified that he had recommended to mother that she should accept this opportunity. He acknowledged that the move would be a difficult adjustment for Warren because he has a positive relationship with his father and stepmother, and he would miss them and his friends, but he believed that the move would be a positive step for Warren and his mother. He stated that Warren was a remarkably healthy, resilient and socially adroit child, and he would adjust quickly to the move and do very well in Washington, D.C. He also testified that he could miss a day or two of school each month for expanded visitation without experiencing academic problems. He stated that Warren told him that although he would miss his dad at sports practices, he wanted to go to Washington.

¶ 11 Father called an expert who testified generally about "parent alienation syndrome" and "disaffecting parent process," which are syndromes alleged to develop in some children as a result of negative speech or action by one parent about the other. He stated that he had never interviewed Warren or his mother and had only limited contact with father. He acknowledged that children do not usually suffer long term psychological problems as a result of moving, and that an extended visitation schedule that provided more intensive time with a parent can be good for a child.

¶ 12 Father's testimony showed that he and Warren had a close relationship; he fully exercised all his visitation rights and he was very involved in Warren's life and his activities, particularly sports. He testified that he was concerned that Warren would not get to play sports in Virginia, and that he would not be able to participate in Warren's school activities and watch him play sports as he does now.

¶ 13 At the conclusion of the hearing, the guardian ad litem advised the court that she believed the move was not in Warren's best interests because father's visitation would be significantly reduced. She did not believe the advantages to Warren or his mother which might result from the were move were "as important as time with both parents."

¶ 14 The trial court ruled against mother's move, concurring with the guardian ad litem that it would be detrimental to the child to lose out on the existing relationship with his father. The judge acknowledged that mother was a fit parent who could care well for Warren in Washington, D.C., or anywhere else, but she thought it would be a "big detriment" to Warren if she were to "sustain the motion and allow him to move to Washington because his relationship with his father will be different."

## II.

¶ 15 As a preliminary matter we address concerns expressed by the parties as to the finality of the judgment and mootness of the issues. We find the order of the trial court is final and appealable and the issues are not moot. Mother's compliance with the trial court's order did not waive her right to appeal. Coerced compliance with the conditions of an order is not tantamount to accepting the benefit of a judgment that waives the right of appeal. A mother does not have to choose between retaining custody of her child and being able to appeal. *Stephen v. Stephen*, 1997 OK 53, 937 P.2d 92. Even should we find that mother's loss of a particular job mooted that issue, her argument is well taken that this is a situation which is capable of being repeated yet evading review, within the well-recognized exception to the mootness doctrine, since she could be offered another job in the future but the acceptance period would end before she could complete the appellate process. *In re D.B.W.*, 1980 OK 125, 616 P.2d 1149.

## III.

¶ 16 Mother contends that the trial court erred in forcing her to give up the position with NASA and remain in Oklahoma in order to retain custody of Warren. She submits the court's order is contrary to Oklahoma statutory authority and case law, and that it is absolutely at odds with dozens of relocation decisions from other states, the vast majority of which recognize the right of a custodial parent to move away from a state with her child and begin a new life elsewhere. She also points out that some states have found such rulings to be an unconstitutional restriction on a parent's fundamental right to interstate travel. She argues that father's opposition to her move because he did not want his visitation schedule modified was an insufficient defense to her motion, and did not justify the trial court's decision denying her permission to move and placing her custody in peril if she did leave with her child. Mother is correct.

¶ 17 As mother correctly argues, in Oklahoma we have a statute which specifically addresses the subject of relocation. Title 10 O.S.1991 § 19 provides:

"A parent entitled to the custody of a child has a right to change his residence, subject to the power of the district court to restrain a removal which would prejudice the rights or welfare of the child."

¶ 18 This provision came to us from the Dakota Territory in 1887, but its construction has never been at issue in a parental relocation case. Nearly identical provisions were adopted by California, (Cal.Fam. Code § 7501), South Dakota (S.D. Codified Laws Ann. § 25–5–13 (1992)), and Montana (Mont.Code Ann. § 40–6–231 (1993)),[1] and the courts of those states have interpreted their provisions as giving the custodial parent a statutory presumptive right to relocate. The meaning of the statute is plain and unambiguous, and we likewise find that in the absence of a showing of prejudice to the rights or welfare of a child, a custodial parent has a statutory presumptive right to change their child's residence.

¶ 19 Based on that presumption, the Supreme Court of South Dakota, in *Fortin v. Fortin*, 500 N.W.2d 229 (S.D.1993), overturned the trial court's order which had restrained the custodial mother from removing her child to Ohio based solely on the trial court's findings that the move would disrupt the father's visitation with the child and lessen father's influence over him. Interpreting its statute, S.D. Cod. L. § 25–5–13 (1992), the South Dakota Court found that relocation should be permitted so long as the parent has a good reason for leaving the state and the move is consistent with the best interests of the child. The Court observed that in our mobile society economic necessity often requires a move to distant places and that the child's best interests prevail over the visitation rights of the noncustodial parent. The Court emphasized the importance of protecting the new post-divorce family unit of the

---

1. These statutes trace to the Field Code. See Carol S. Bruch & Janet M. Bowermaster, The Relocation of Children and Custodial Parents: Public Policy, Past and Present, 30 Fam. L.Q. No. 2, 245.

child and custodial parent, recognized that the child's best interest is closely related to the best interest of that family unit, and pointed out that it is only in the context of what is best for the custodial family unit that changes in the terms of visitation for the noncustodial parent should be considered.

¶ 20 In *In re Marriage of Burgess*, 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473 (1996), the California Supreme Court held its statute, Cal.Fam.Code § 7501, gives a custodial parent a presumptive right to relocate, and the parent therefore does not bear the burden established by another statute to show that an intended move is "necessary" or "essential or expedient." The court held that the other provision of the Family Code would not be construed by implication to apply to a custodial parent seeking to relocate, as the additional burden would abrogate the presumptive right of a parent to change the residence of a minor child. The court stressed the paramount need for continuity and stability in custodial arrangements and that the emotional bonds of the child and primary caretaker weigh heavily in favor of maintaining established custody. Therefore, in the absence of a substantial showing, custody should not be reexamined. The court noted that a change of custody is not justified simply because the custodial parent has chosen to reside elsewhere, but only if as a result of the relocation the child will suffer harm. The court also stressed the need to grant deference to the custodial relationship.

¶ 21 The Supreme Court of Montana held in *In Re Marriage of Paradis*, 213 Mont. 177, 689 P.2d 1263 (1984), that in the absence of facts supporting a finding of prejudice, the custodial mother was presumptively entitled under Mont.Code Ann. § 40–6–231, now repealed (sec. 39, ch. 343, L.1997), to move with her child to Hawaii and settle in a new home.

¶ 22 Father argues that *Hornbeck v. Hornbeck*, 1985 OK 48, 702 P.2d 42, and *Fletcher v. Fletcher*, 1961 OK 129, 362 P.2d 691, sustain the trial court's ruling in his favor. *Fletcher* does not support father's position, as it concerned questions of the court's continuing jurisdiction over children based on extreme facts. The father was unable to see his children because they had been taken to Bermuda by their mother without father's knowledge or consent and without any arrangements for his visitation. Father sought to modify provisions for support and custody of his children during the summers months, since by reason of mother's move to Bermuda and father's own remarriage and his modest means, he had been "deprived of his right of visitation." The Court agreed that for all practical purposes father had been so deprived. The Court held that mother had not by her absence defeated the continuing jurisdiction of the court over the children, and found these changes could be considered by the trial court in determining whether any modification was justified or necessary. No serious argument can be made that the facts of the instant case present an unreasonable situation where father will be "deprived" of contact with his son by a change in his visitation schedule.

¶ 23 We also disagree with father's contention that *Hornbeck* is "on all fours" with this case. The underlying facts of *Hornbeck* involved efforts of a noncustodial father to modify the custody provisions of the divorce decree when he learned his ex-wife was planning to remarry and move to Missouri. The issue before the Court was not the relocation, but whether the trial court had exceeded its power when it entered an order granting *joint* custody on father's motion to modify the original award granting mother sole custody. The Court found that the joint custody statute in issue, 12 O.S.Supp.1983 § 1275.4, could be applied to a motion to modify an existing custody order as well as to the initial award. As father points out, the Court did rely on the extreme "deprivation" facts of *Fletcher*, and affirmed the trial court's finding that the move would cause the child to suffer from an "effective deprivation of meaningful contact" with father. Father misapprehends the reach of *Hornbeck*. It did not determine a relocation *per se* to constitute a change of condition, but held the evidence supportive of a finding that the relocation would amount to such a deprivation as to constitute such a change. Again, under the testimony before us here no such deprivation is even contemplated.

¶ 24 The subject of relocation of a custodial parent has become a very popular topic in writings by scholars in family law in recent years [2] and, while this court has not had occasion to pass on the issue, it has been extensively litigated elsewhere. The burgeoning number of decisions should not be surprising, since half of all marriages end in divorce, and many of those parents who are awarded custody will, for a variety of reasons, desire to move their children to a different geographical location. The interests of the custodial parent who desires to relocate and take the child to a new location and a new life are often in sharp conflict with those of the noncustodial parent who wants visitation and contact with the child to remain frequent and constant. Speaking to this point, the Supreme Court of California observed in *Burgess*, 51 Cal.Rptr.2d 444, 913 P.2d at 480, that:

[O]urs is an increasingly mobile society ... approximately one American in five changes residences each year. Economic necessity and remarriage account for the bulk of relocations. Because of the ordinary needs for both parents after a marital dissolution to secure or retain employment, pursue educational or career opportunities, or reside in the same location as a new spouse or other family or friends, it is unrealistic to assume that divorced parents will permanently remain in the same location after dissolution or to exert pressure on them to do so.

¶ 25 The majority of jurisdictions which have considered this subject have adopted approaches which favor the custodial parent's right to move away from the state with their child even though they do not have a presumptive right to relocate statute such as 10 O.S.1991 § 19.99.[3] While the relevant statuto-

**2.** See e.g. Arthur B. LaFrance, Child Custody and Relocation: A Constitutional Perspective, 34 Louisville Fam. L. 1 (1995); Carol S. Bruch and Janet Bowermeister, The Relocation of Children and Custodial Parents: Public Policy, Past and Present, 30 Fam. L. 245 (1996); Tabitha Sample and Teresa Reiger, Relocation Standards and Constitutional Considerations, 10 J.Am.Acad.Matrim. L. 229 (1998); William G. Austin, Relocation Law and the Threshold of Harm; Integrating Legal and Behavioral Perspectives, 34 Fam. L.Q. 63 (2000); Judith S. Wallerstein and Tony J. Tanke, To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce, 30 Fam. Q. 305 (1996); Janet M. Bowermaster, Sympathizing With Solomon: Choosing Between Parents in a Mobile Society, 31 U. Louisville J. Fam.L. 791 (1992); Caroline Heil, Relocation Cases as Change in Custody Proceedings: "Judicial Blackmail" or Competing Interests Reconciled 51 S.C.L.Rev. 885 (2000); Edward Sivin, Residence Restrictions on Custodial Parents: Implications for Right to Travel, 12 Rutgers L.J.341 (1981).

**3.** See e.g. the following and authorities cited therein: *Auge v. Auge*, 334 N.W.2d 393 (Minn. 1983) (since denial of permission to custodial parent to move would effect change in custody, custody modification statute should be construed as establishing implicit presumption that relocation will be permitted in absence of proof that move would endanger child's health or for vindictive purpose); *Lane v. Schenck*, 158 Vt. 489, 614 A.2d 786 (1992) (relocation must be allowed unless noncustodial parent proves that child's best interests would be so undermined by a relocation that transfer of custody is necessary);

*Aaby v. Strange*, 924 S.W.2d 623 (Tenn.1996) (relocation should be allowed in absence of showing that move poses specific, serious threat of harm to child or for vindictive purpose; a move in any child's life, whether in a one or two parent home carries potential for distress and such common moving-related phenomena cannot constitute basis for a drastic change a custody); *In re Marriage of Francis*, 919 P.2d 776 (Colo. 1996) (presumption in favor of custodial parent's right to move away with child and relocation will be allowed in the absence of noncustodial parent's showing that move will endanger child); *Watt v. Watt*, 971 P.2d 608 (Wyo.1999) (order changing custody from mother planning to relocate within state to attend college infringed on her constitutional right to travel; relocation by itself is not a change sufficiently material and substantial to justify reopening question of custody); *Swonder v. Swonder*, 642 N.E.2d 1376 (Ind. Ct.App.1994) (noncustodial parent bears burden of overcoming custodial parent's right to continued custody and must make showing of decisive, substantial and continuing change of condition making existing custody unreasonable and an out of state move is not such a substantial change); *Mize v. Mize*, 621 So.2d 417 (Fla.1993) (change in residence will ordinarily be approved if custodial parent desires to move for a well-intentioned reason and belief that relocation is best for parent's—and, it follows, the child's—well-being, rather than for a vindictive purpose); *Ireland v. Ireland*, 246 Conn. 413, 717 A.2d 676 (1998) (noncustodial parent opposing proposed relocation required to prove relocation is not in child's best interests; in making that determination trial court should consider interests of new family unit as a whole, including independent interests of custodial parent); *Yannas v. Frondistou–Yan-*

ry enactments which are placed at issue in those cases vary widely from state to state and some states have no applicable statutes, the decisions are generally based on judicial recognition of the post-divorce new family unit, and stability and continuity of the child's relationship with his primary custodian as the most important factor affecting the child's welfare. These courts also recognize that the well-being of the child is fundamentally interrelated with the well-being of the custodial parent, and that parent is the best person to make decisions affecting the child and the new family group, such as where they will reside. The courts therefore accord those childrearing decisions deference, and hold that judicial intervention in that decision making process should be limited to only the most extreme circumstances. We find the reasoning of these courts persuasive in our effort to establish a standard for determination of relocation actions.

¶ 26 The following thoughtful observation from *Tropea v. Tropea*, 87 N.Y.2d 727, 642 N.Y.S.2d 575, 665 N.E.2d 145, 148 (1996), has often been quoted by courts considering this subject:

> Like Humpty Dumpty, a family, once broken by divorce, cannot be put back together in precisely the same way. The relationship between the parents and the children is necessarily different after a divorce and, accordingly, it may be unrealistic in some cases to try to preserve the noncustodial parent's accustomed close involvement in the children's everyday life at the expense of the custodial parent's efforts to start a new life or to form a new family unit.

¶ 27 The court in *D'Onofrio v. D'Onofrio*, 144 N.J.Super. 200, 365 A.2d 27, 29 (1986), discussed considerations of the post-divorce family as follows:

> The children, after the parents' divorce or separation, belong to a different family unit than they did when the parents lived together. The new family unit consists only of the children and the custodial parent, and what is advantageous to that unit as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interests of the children. It is in the context of what is best for that family unit that the precise nature and terms of visitation and changes in visitation by the noncustodial parent must be considered.

¶ 28 And, in *Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn.1993), the court explained:

> [Relocation] cases reflect the collective wisdom of both the courts and child psychologists that children, especially those subjected to the trauma of a divorce, need stability and continuity in relationships most of all. This recognition has led to a strong presumption in favor of continuity of placement, which is reflected in the well-established rule that courts will not entertain petitions for change of custody unless there has been some change in circum-

*nas*, 395 Mass. 704, 481 N.E.2d 1153 (1985) (mother allowed to remove children to Greece, a move she asserted was to her financial, emotional and social advantage; any good, sincere reason for custodial parent wanting to relocate suffices for statutory test; because interests are so interwoven, determination of the child's best interests requires that the interests of the custodial parent be taken into account.); *Holder v. Polanski*, 111 N.J. 344, 544 A.2d 852 (1988) ("cause" requirement of statute met by any good faith reason for move therefore mother's explanation that she wanted to live closer to her relatives and to make a fresh start in life sufficed); *Long v. Long*, 127 Wis.2d 521, 381 N.W.2d 350 (1986) (custodial parent seeking to remove a minor child out of state has the power and responsibility to make decisions for the family unit; court has broad latitude in modifying visitation arrangement and has limited latitude in changing custody); *Barstad v. Barstad*, 499 N.W.2d 584 (N.D.1993) (weighing statutory factors to determine best interest of child must be "gauged against the backdrop of stability of child's relationship with the custodial parent" as maintenance of custodial stability and continuity is very compelling consideration); *Spain v. Holland*, 483 So.2d 318 (Miss.1986) (custodial parent's move to England because of job transfer is not a material change adversely affecting child for change of custody purpose; the judicial eye in such cases searches for adverse effects beyond those created (a) by the divorce and (b) by the geographical separation from one parent; ours is a mobile society where opportunity and economic necessity transport perfectly responsible adults many miles from their homes); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d, 328 (2000) (mother met threshold test of demonstrating legitimate reason for relocation with showing of career advancement and moving closer to extended family).

stances that has rendered the custodial parent unfit or has exposed the child to some form of risk. In the view of the overwhelming number of American courts, the custodial parent's relocation, all other factors being equal, is not such a 'change in circumstance,' because it does not inherently affect the fitness of the custodial parent.

¶ 29 The fact that father's visitation would be altered by the mother's relocation is understandably difficult and upsetting for him, but maintaining his existing visitation schedule did not justify the trial court's order restricting mother's ability to leave Oklahoma to pursue her career opportunity and attempt to find better life for herself and Warren. The cases uniformly hold that visitation rights alone are an insufficient basis on which to deny relocation and thereby change custody of a child. A custodial parent's relocation should not be disallowed solely to "maintain the existing visitation patterns". *Auge v. Auge* 334 N.W.2d at 398. See also e.g. *Long v. Long,* 127 Wis.2d 521, 381 N.W.2d 350 (1986); *Taylor v. Taylor,* 849 S.W.2d 319 (Tenn.1993).

¶ 30 In *D'Onofio v. D'Onofio, supra,* the court stated the following which is relevant here:

The court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial. It is at least arguable, and the literature does not suggest otherwise, that the alternative of uninterrupted visits of a week or more in duration several times a year, where the father is in constant and exclusive parental contact with the children and has to plan and provide for them on a daily basis, may well serve the paternal relationship better than the typical weekly visit which involves little if any exercise of real paternal responsibility. It is further clear that a noncustodial parent is perfectly free to remove himself from this jurisdiction despite the continued residency here of his children in order to seek opportunities for a better or different life style for himself. And if he does choose to do so, the custodial parent could hardly hope to restrain him from leaving this State on the ground that his removal will either deprive the children of the paternal relationship or depreciate its quality. The custodial parent, who bears the essential burden and responsibility for the children, is clearly entitled to the same option to seek a better life for herself and the children, particularly where the exercise of that option appears to be truly advantageous to their interests and provided that the paternal interest can continue to be accommodated, even if by a different visitation arrangement than theretofore.

¶ 31 The evidence presented below did not support the trial judge's decision restricting mother from relocating under peril of losing custody. There was no showing that Warren's welfare was placed at risk by remaining in the custody of his mother; she is unquestionably a fit parent who takes good care of her son and makes reasonable decisions regarding his care. Maintaining father's existing visitation schedule was not a sufficient basis for the denial of mother's relocation. The trial court's order was against the clear weight of the evidence.

¶ 32 The test for modifying custody based on a change of circumstances is set forth in *Gibbons v. Gibbons,* 1968 OK 77, 442 P.2d 482, and that test and its allocation of the burden of proof applies here. A custody order may not be modified unless the applicant parent establishes a permanent, substantial and material change of circumstances which directly and adversely affects a child in such a material way that as a result the child would be substantially better off if custody were changed to the other parent as requested.

¶ 33 In a relocation case the noncustodial parent seeking to restrain the custodial parent from moving must meet a heavy burden to show that circumstances justify reopening the question of custody. The custodial parent's decision to move from Oklahoma to a different location with the

child is not in itself a change of circumstances which will justify a change of custody. The dispositive issue is not the decision to relocate, for the custodial parent has the presumptive right under 10 O.S.1991 § 19 to move with the child. The dispositive issue is the fitness of the custodial parent and whether the child will be placed at risk of specific and real harm by reason of living with the custodial parent in the new location.

¶ 34 Limiting judicial intervention in post-divorce decision making is an overriding goal of the relocation cases from other jurisdictions discussed above. We join in that view. It does not serve the interests of the parties, the judiciary or the public to require "trial courts to 'micromanage' family decision making by second -guessing reasons for everyday decisions about career and family." *Burgess*, 51 Cal.Rptr.2d 444, 913 P.2d at 481.

¶ 35 In *In re Marriage of Pape*, 139 Wash.2d 694, 989 P.2d 1120, 1128 (2000), the court explained:

"We are aware of and are sympathetic to the difficulties faced by parents whose children move, with the other parent, some distance away. However, these difficulties are a consequence of the dissolution of marriage. Once the decree of dissolution is entered, a trial court's involvement in decision-making for the family is minimized. The court's role in a family's life following dissolution of marriage is not to review every parenting decision to determine if it is in the child's 'best' interests. Once the court has determined the best residential placement of the child, based on the best interests standard set forth in the statute, the important job of the court is finished. The court does not again become significantly involved in parenting decisions, unless the child's well-being is seriously threatened by parenting decisions. A change in the location of the child's place of residence, with the primary residential parent, generally does not pose such a serious threat."

¶ 36 Speaking on the necessity of judicial deference to the custodial parent's relocation decision, the Supreme Court of Vermont stated in *Lane v. Schenck*, 158 Vt. 489, 614 A.2d 786, 789 (1992):

[W]e cannot condone a process that substitutes the judgment of a court for that of the custodial parent merely because the court would have done something different if it had been the parent. At the time of divorce, mother was given the powers [of custody] which included the right to decide where she would reside with the children. The place of residence for a family is central to childrearing, and thus that decision is understandably entrusted to the parent awarded parental rights and responsibilities. Mother's decision as to place of residence was overruled because the court's judgment on that issue was entitled, under its view of the law, to more weight than hers. Mere disagreement, however, is not enough ... The court may differ with the custodian as to the wisdom of a certain parental decision, but it may not lightly replace the judgment of the custodian with its own.

¶ 37 The right of the post-divorce family unit to the same child rearing autonomy and freedom from unwarranted governmental interference as is accorded an intact two-parent family, was expressly recognized by five members of this Court in *Stephen v. Stephen*, 1997 OK 53, 937 P.2d 92, where a noncustodial father sought to obtain custody of his sons because the custodial mother was home-schooling them against his wishes. The trial court ruled that home schooling was not in the best interests of the children and ordered that their custody be changed to their father unless they were returned to public school. The *Stephen* majority reversed the order, finding that it was against the clear weight of the evidence and an abuse of discretion. In an opinion specially concurring in *Stephen*, 937 P.2d, at 98, (Simms, J., concurring), however, five Justices expressly recognized the primacy and autonomy of that new family unit created by the divorce and stated:

It is not the business of the courts to become involved in everyday decisions of child rearing which are properly the prerogative of the parents or, in the case of divorced parents, the custodial parent ... In the absence of specific provisions in the divorce decree or an agreement between the parents, the sole decision making pow-

er over significant decisions affecting the child's welfare, including education, resides in the custodial parent. (citations omitted).

¶ 38 Interestingly, that concurring opinion went on to cite with approval the case of *Lane v. Schenck*, supra, discussed above, where the Supreme Court of Vermont held that a new family unit was entitled to deference in considering its choice to relocate to another state.

¶ 39 Inasmuch as the Court decides this matter in mother's favor based upon our interpretation of 10 O.S.1991 § 19 and upon case law, we find it unnecessary to consider whether mother's constitutional right to interstate travel was violated by the trial court's order, a challenge mother mentions, but does not pursue. See *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968); *Watt v. Watt*, 971 P.2d 608 (Wyo. 1999).

¶ 40 No facts were presented below which showed prejudice to Warren in moving with his mother to Washington, D.C. Appellant is, without challenge, a fit mother, and her decision to relocate with Warren was a childrearing decision which was well within her right to make as his custodial parent. The trial court erred in denying her motion and restricting her statutory right to relocate and change the residence of her child. The cause is reversed and remanded for proceedings consistent with this decision.

¶ 41 HARGRAVE, C.J., WATT, V.C.J., HODGES, LAVENDER, KAUGER, BOUDREAU, WINCHESTER, JJ., concur.

¶ 42 OPALA, J., concurs in part, dissents in part.