2002 OK 70

**Rocky CASEY, Jr., Plaintiff/Appellee,**

v.

**Tammy CASEY, now Compton, Defendant/Appellant.**

**No. 96,697.**

Supreme Court of Oklahoma.

Sept. 24, 2002.

---

**764**

Lauren LeBlanc Day, Oklahoma City, OK, for Defendant/Appellant.

Wesley Brown, McAlester, OK, for Plaintiff/Appellee.

KAUGER, J.

¶ 1 The primary issue presented is whether the defendant/appellant, Tammy Casey (mother/custodial parent), agreed by all parties to have demonstrated a full commitment to the responsibilities of parenthood, must forfeit the right to travel on threat of the loss of her children. Secondarily, we are asked to determine whether a judicial balancing of the equities supports an award of appeal-related attorney fees. Pursuant to binding precedent [1]—*Kaiser v. Kaiser*, 2001 OK 30, ¶ 33, 23 P.3d 278 and *Abbott v. Abbott*, 2001 OK 31, ¶ 8, 25 P.3d 291, we determine that the record is insufficient to rebut the custodial mother's presumptive right to move out-of-state with her children.[2] Although the mother has prevailed on the custody issue, the equities are not so in her favor as to impose appeal-related attorney fees on the plaintiff/appellee, Rocky Casey, Jr. (father/non-custodial parent).

## FACTS

¶ 2 The mother and father were married in 1984, and had two children—a son, J.W.C., born on May 29, 1989, and a daughter, S.R.C., born on May 31, 1991. The couple divorced in February of 1995. The mother was awarded custody of the two minor children. A year later, the trial judge, Honorable Thomas M. Bartheld, entered a modification order amending the father's visitation schedule and prohibiting either parent from removing the children from Pittsburg Coun-

1. Neither party argues that either *Kaiser v. Kaiser*, 2001 OK 30, ¶ 33, 23 P.3d 278 or *Abbott v. Abbott*, 2001 OK 31, ¶ 8, 25 P.3d 291 were wrongly decided or that the Court should reassess its commitment to the causes as precedent. See, *Hartline v. Hartline*, 2001 OK 15, ¶ 11, 39 P.3d 765; *Rodgers v. Higgins*, 1993 OK 45, ¶ 29, 871 P.2d 398. Although the father argues that the cases, decided prior to the initial modification proceeding filed in January of 2001, were inapplicable to the trial court's initial decision, he asserts that the trial court applied the cases to the facts and reached the conclusion that the children would be subject to real and specific

harm if allowed to move out of state with the mother. The trial court issued its initial decision on February 9, 2001. *Kaiser*, this note, supra, was promulgated on April 3, 2001, and *Abbott*, this note, supra, was decided on April 10, 2001.

2. Title 10 O.S.2001 § 19 provides:

"A parent entitled to the custody of a child has a right to change his residence, subject to the power of the district court to restrain a removal which would prejudice the rights or welfare of the child."

ty, Oklahoma for the purpose of permanent residency without court approval.

¶ 3 In January of 2001, both the father and the mother filed motions to modify. The father sought custody of the children, then 11 and 9 years of age, respectively. The mother asked to remove the children from Oklahoma so that she might take advantage of an employment opportunity that would benefit the family unit and requested a change in the father's visitation schedule.

¶ 4 For over six years, the mother had been working as a purchasing/office manager for Wabash (employer), commuting between 80 and 90 miles a day, to Checotah, Oklahoma at an annual salary of $26,500.00. Her company extended her a job offer which required that she move to Indiana for a salary of $37,500.00—approximately a 42% increase. Along with the offer of a raise, the mother was informed that Wabash's Oklahoma plant would be closing and that the employer would have no job for her within the state. In anticipation of having to obtain other employment, the mother made inquiries concerning job opportunities finding nothing in Pittsburg, Muskogee or McIntosh Counties comparable to the $26,500.00 she had been earning.

¶ 5 At the initial modification hearing held on February 9, 2001, the mother testified that she planned to locate in Kokomo, Indiana—a community of about 40,000. The mother investigated the school system in Kokomo and was prepared to make arrangements for the children both before and after school. She also testified that she and the children planned, if her modification request were granted, to stay temporarily with Paul Limpkey (Limpkey)—a gentleman the mother had been dating for an extended period of time.[3] Although Limpkey was in the process of moving the children's furniture to his home at the time of the hearing, the mother indicated that the furniture would be returned if she did not receive permission from the court to relocate—her reason being that she would not leave Oklahoma if it meant forfeiting custody of her children.[4]

¶ 6 The record is devoid of any testimony that the mother was unfit or an inappropriate placement for custody. The father testified that: 1) the children got along very well in the mother's care; 2) she took care of their daily needs; and 3) he had nothing derogatory to say about her parenting skills. Primarily, he hated to see his children leave because he would miss them and because he thought their school work and outside activities might suffer.[5]

¶ 7 The father presented one witness, a teacher from the Crowder schools, who testified generally that students who are transferred between school districts often experi-

---

**3.** Transcript of proceedings, February 9, 2001, Tammy Casey's testimony providing in pertinent part at pp. 24–25:

"... Q Your're not going to be living with him [Paul Limpkey]?
A I'm going to stay with him until I find a house.
Q You're going to stay with him until you find a house?
A Yes, I am.
Q With the children?
A Yes...."

**4.** Transcript of proceedings, February 9, 2001, Tammy Casey's testimony providing in pertinent part at pp. 25–26:

"... Q And what of the children's things has he [Paul Limpkey] taken?
A Their furniture.
Q And has he taken those things to his house?
A He's not taking them any where until he gets a phone call from me.
Q I thought you said he's taking them to Indiana.

A He's on his way. If I call him and tell him to come back he's going to come back and put them in a storage building.
Q Why would you call him and tell him to come back.
A Because if my children do not get to go with me to this job then I will stay here...."

**5.** Transcript of proceedings, February 9, 2001, Rocky Casey, Jr.'s testimony at pp. 32–33:

"... Q Okay. Is it fair to say that the kids have gotten along very well in your ex-wife's custody over the last several years?
A Yes.
Q Okay. She has done a good job of raising your kids?
A Yes.
Q She cares for their needs daily?
A Yes.
Q Essentially you really don't have anything bad to say about her raising your kids, would that be a fair statement?
A That would be fair...."

ence a period of adjustment[6] and that she thought that the children were having a difficult time. The teacher had seen the daughter crying and indicated that the son had missed a good deal of school. Nevertheless, the teacher stated that she had no reason to believe that the children wouldn't adjust well and do fine in any school system. She also admitted that the son may have missed school due to an illness.[7] She did not state that she had actually talked to either of the children about the possibility of a move. The teacher acknowledged that the children were gifted and that the mother was an interested parent. She also testified that she knew nothing detrimental about the mother.[8]

¶ 8 At the close of the hearing on February 9th, the trial judge recognized that much of the children's success in school had been because of the mother's involvement and the father's participation with the children.[9] The trial judge visited with the children and acknowledged that both were upset. He indicated that much of the turmoil had been caused by false information given to them by both parents. Although the trial judge recognized that the mother was a very good parent, he refused to allow the mother to move with her children but agreed to leave custody unchanged if she did not leave Oklahoma. The trial judge indicated he would review the case in May[10] and granted the mother the right to move with the children as long as she stayed within the confines of the state.

¶ 9 The mother filed a second motion to modify on April 24th, 2001, requesting that the trial court review its February order. In a hearing on the motion on May 30th, the trial judge indicated that he had not intended to revisit his ruling unless the mother chose to move. Nevertheless, he agreed to order a transcript of the February proceedings and

6. Transcript of proceedings, February 9, 2001, Diane Quinn's testimony providing in pertinent part at pp. 109–110:

"... Q Can you tell me the short term or what you have observed from a child that has come in like that generally as to how it relates to school and things like that?
... A Yes, I think there is always an adjustment period when there is a move like that...."

7. Transcript of proceedings, February 9, 2001, Diane Quinn's testimony providing in pertinent part:

at pp. 116–17: "... Q ... What do you mean you don't think this is good for the children? A I think the prospect of moving away from family and friends has been detrimental to them. I have seen [S.] crying. I've seen [J.] miss a lot of school maybe he had the flu. I know in my case if I had to decide between my mother and my father it would be very detrimental to me...."
at p. 115: "... Q There is no reason you would have to believe that they wouldn't adjust well and do well in any school system they are in, would you agree with that? A That's speculation, there is no reason for me to believe they wouldn't...."

8. Transcript of proceedings, February 9, 2001, Diane Quinn's testimony providing in pertinent part at pp. 114–15:

"... Q To your knowledge does she show an interest in her kids? A Yes. Q So you're not here talking bad about her, would that be fair to say? A Yes.

Q ... These kids are pretty gifted, aren't they? A Yes, they are...."

9. Transcript of proceedings, November 9, 2001, statements by Honorable Thomas M. Bartheld, providing in pertinent part at p. 11:

"... I mean we are not talking about kids that are struggling in school. We are talking about kids that breeze through school and how wonderful that is. It's due to the mother's involvement in school. The father's involvement with the kids...."

10. Transcript of proceedings, November 9, 2001, statements by Honorable Thomas M. Bartheld, providing in pertinent part at pp. 24–25:

"... I am not going to permit them to move in the middle of a school year at all. So the bottom line if you wish to move to Indiana, accept that job and live with Mr. Limpkey the kids are staying here. They—but that puts me in a quandary because if you choose not to, if you stay here I'm leaving custody with you because you've proven and Mr. Brown is correct unlike the past two hearings Mr. Casey didn't come in here and say anything but good about you and I believe it I've seen the results you're a good mother, very good mother.
... So if you choose to go ahead and move up there then I'm going to award custody to Mr. Casey. If you choose to remain here custody remains with you. If you want to go up there and look for homes something like that, check into the schools I will review the case in May and let you have visitation for the spring break...."

to set another hearing once he'd had the opportunity to read the testimony. During these proceedings, the mother's attorney stated that the Wabash plant had closed in Oklahoma and that the mother had a second job offer in Indiana. Concerned about how the mother's investigation of the job might affect custody, he elicited an agreement from opposing counsel that the mother's cause would not be prejudiced if she went to Indiana until the case was heard in July.[11]

¶ 10 At the hearing on July 9, 2001, trial judge heard argument from counsel concerning the appropriate standard of review and determined he would treat the matter as a new motion to modify.[12] The mother testified that following the hearing in February, she informed her employer that she would be unable to accept the job offer in Indiana. The employer allowed her to continue working from home after the Oklahoma plant closed and made a second job offer in March of 2001. The offer involved an upgrade in her training which might ultimately result in the mother earning a minimum salary of $80,000.00.[13] In the interim between the February and May hearings, the mother sent out ninety resumes to employers in Oklahoma and visited the employment office. She got no response which would have matched her existing salary.

¶ 11 Because she could no longer work from home, following the May 30th proceed-ings, the mother went to Indiana temporarily. However, she did not move in with Limpkey as she had formerly planned. Rather, the mother signed a three month lease on an apartment. Further, she testified that she had no plans to move in with Limpkey or to marry him should the trial court grant her motion to modify.

¶ 12 While in Indiana, the mother located a person her daughter could work with training as a barrel racer—a sport she enjoys in Oklahoma. She also investigated the Kokomo school's curriculum, finding it superior to the one in the Crowder schools. There were also additional extra-curricular activities available in Indiana which her children had not enjoyed in Oklahoma—both before and after school.

¶ 13 John Duff (Duff), the Caseys' son's teacher testified at the July 9th hearing on behalf of the mother. Duff believed that the Caseys' son was very well adapted, outgoing and exceptionally smart. He never observed anything in the son indicative of emotional problems. Duff compared the Crowder and Kokomo curriculums. Although he found some comparisons, he felt the Kokomo schools' enrichment programs for exceptional students like the Caseys' son would be very beneficial. Duff was confident that the son would have no difficulty adjusting in the Kokomo school district or anywhere else he might be enrolled.[14] He also felt that an

11. Transcript of proceedings, May 30, 2001, statement of Mr. Brown, representing the father, providing in pertinent part at p. 22:

"... MR. BROWN: I'm saying she can do what she wants to without prejudice through his four weeks of visitation this summer. He gets four weeks visitation no matter what...."

12. Transcript of proceedings, July 9, 2001, statement of the trial court providing in pertinent part at p. 12:

"... THE COURT: Okay. Well what I will do is treat this as a new motion to modify...."
Nevertheless, at the close of the hearing, the trial judge indicated that it was really only a motion to supplement the record of the February 9th hearing and that insufficient evidence of a material change had been presented to alter his former ruling.

13. Transcript of proceedings, July 9, 2001, Tammy Casey's testimony providing in pertinent part at p. 18:

"... Q After a person is trained in Lotus and J.D. Edwards, what kind of salaries can they command at say the southwest region of the United States?
A Probably after a couple of years of experience and all the training they can make around 80,000 a year. That's probably a minimum ..."

14. Transcript of proceedings, July 9, 2001, John Duff's testimony providing in pertinent part at pp. 55–56:

"... Q At any time during the past school year that you had [J.] in your class, did you see him having any emotional problems?
A No....
Q What kind of student is [J.]?
A [J.] is very well adapted student, very intelligent, out going, exceptionally smart.
Q Have you had the opportunity to review the curriculum at the Western—Northeastern School District in Kokomo, Indiana?
A Yes.

adjustment in visitation schedules which would allow the children to take advantage of the educational opportunities in Indiana would ultimately be beneficial to both children.[15]

¶ 14 The only two witnesses heard at the July 9th hearing were the mother and Duff. The father did not testify nor did he present any evidence in contravention of that elicited by the mother. Nevertheless, the trial court determined that the mother's evidence was insufficient to support an award of custody should she move permanently to Indiana.

¶ 15 The journal entry of judgment was filed on August 1, 2001, granting the father's demurrer to the evidence and keeping in place the trial court's February 9th order requiring that the mother give up her children if she moved out of state. The Court of Civil Appeals upheld the trial court and the mother filed certiorari on April 15, 2002. We granted certiorari on July 3, 2002.

## I.

¶ 16 THE CAUSE IS GOVERNED BY THE COURT'S PRONOUNCEMENTS IN *KAISER v. KAISER* AND *ABBOTT v. ABBOTT* HOLDING THAT WHERE THE CUSTODIAL PARENT IS FIT AND THERE IS NO RISK OF REAL AND SPECIFIC HARM TO THE CHILD, THE DECISION TO RELOCATE THE FAMILY RESTS WITHIN THE CUSTODIAL PARENT'S AUTHORITY SUBJECT TO THE TRIAL COURT'S APPROVAL.

¶ 17 The mother asserts that governing precedent—*Kaiser v. Kaiser,* 2001 OK 30, ¶ 33, 23 P.3d 278 and *Abbott v. Abbott,* 2001 OK 31, ¶ 8, 25 P.3d 291—mandates that a custodial parent, agreed by all parties to have demonstrated a full commitment to the responsibilities of parenthood, be allowed to exercise her right to relocate without threat of the loss of her children. Although the father argues that neither *Kaiser* nor *Abbott* apply because they were decided subsequent to the initial decision on modification, the father insists that *Kaiser* and *Abbott* formed the basis of the trial court's determination that should the mother permanently relocate

---

Q And do you think that [J.] would have any problem adjusting to that curriculum?
A No. what I saw it's very comparable to what Crowder offers.... They have some enrichment programs, the extra programs for the exceptional students and I think he would benefit a lot from those programs.
Q Does Crowder have enrichment programs for exceptional students?
A No, they're really restricted.
Q Based on your familiarity with [J.] do you think that he will have any problems if he goes to school in Kokomo?
A No, [J.], is one of those students that I think could adapt any where. He's one that challenged me in this last year as far as keeping ahead of him as far as his thought processes. He likes to debate a lot. He's just one of those he's always striving to learn and just searching for more information...."

15. Transcript of proceedings, July 9, 2001, John Duff's testimony providing in pertinent part at pp. 62–63:

"... Q Mr. Duff, if [J.] or [S.] were to miss some weekend visitation if they moved to Indiana with their dad, do you think the enrichment programs and stuff that they would be able to take those at school and kind of off set?

A I think so.
Q So if they got a little extra time with dad in the summer or on the holiday, you think it would be worth these children getting those programs?
A I think in [J.'s] case, yes....
Q Let me take it [sic] what you're saying. You're saying if she takes the children to Indiana with her that the enrichment program is going to off set the time spent with father? Is that what you're telling the Court?
A I think from what I got to know about [J.] and the way he is, yes. He would adapt very well.
Q No, that's not what my question is. My question is what Mr. Zellmer asked you. Mr. Zellmer asked you if he didn't get to see his father on some weekends and maybe not as much as [sic] sees him now would these enrichment programs at this good school in Kokomo—I doubt it's any better than Crowder but if it's better than Crowder, would that offset that contact with a parent?
A In this case I think so.
Q You think it would be in his best interest to be in the Kokomo school than the Crowder School?
A Yes, I do.
Q What about [S.]?
A In the long run probably...."

out-of-state, custody would be altered. We disagree.

¶ 18 In both *Kaiser* and *Abbott*, supra, this Court acknowledged that the decision of the custodial parent to move is not the dispositive issue in modification proceedings. Rather, the focus is on the fitness of the custodial parent and the potential that the child will be placed at risk of real and specific harm while living at the new location. If the parent is fit and there is no evidence of prejudice to the child, *Kaiser* and *Abbott* clearly place the decision to relocate within the parent's ambit. Further, the cases recognize that, absent prejudice to the rights or welfare of the child, the custodial parent's decision to change the child's residence is guaranteed by statute.[16]

¶ 19 Therefore, under *Kaiser* and *Abbott*, supra, the questions to be determined are: 1) whether the custodial parent is fit—a matter agreed to and acknowledged both by the trial court and by the father; and 2) whether there is a risk of real and specific harm to the children while living in the new location. The only evidence detrimental to the mother's cause was presented through a teacher indicating that: 1) children generally have a difficult time adjusting to a change in schools; 2) the daughter had been seen crying at school; and 3) the son had missed a good deal of school. There is no indication in the record that, prior to testifying, the teacher had spoken to either of the children about the move. Further, the teacher admitted that the son may have missed school due to illness. Finally, she conceded that she had no reason to believe that the children couldn't adjust in a new school setting.[17]

¶ 20 In contrast, there was positive evidence that the children would benefit from the move. The son's teacher testified that: 1) the curriculum in the Indiana school was superior to that offered in Crowder; and 2) both the son and the daughter would eventually adjust and benefit from the move—even though their visitation patterns with the father would alter.[18]

¶ 21 This is not a situation where the parent has failed to demonstrate a full commitment to the responsibilities of parenthood. The record is devoid of evidence that the mother is anything other than responsible, interested and fit to continue as the custodial parent. Rather than indicating that the children will suffer from the move, the record supports a determination that the children will benefit—both financially as the mother's income increases and through the offer of a superior school curriculum. Our decisions in *Kaiser v. Kaiser*, 2001 OK 30, ¶ 33, 23 P.3d 278 and *Abbott v. Abbott*, 2001 OK 31, ¶ 8, 25 P.3d 291, mandate that the mother should be allowed to pursue what may well prove to be a superior economic rank for her family unit and an upgrade in educational opportunities for her children.

¶ 22 These parents have been before the trial court on several occasions—some of which may have understandably tested the patience of the trial judge.[19] We are aware that the trial court did not have the benefit of the teachings of *Kaiser* and *Abbott*, supra, when it issued the initial decision on modification in February of 2001—both cases having been decided the following April. However, when the trial court revisited his February order and issued the second ruling on modification in July which was memorialized by order in August, man-

---

16. Title 10 O.S.2001 § 19, see note 2, supra.

17. See, ¶ 7 and accompanying footnotes, supra.

18. See, ¶ 13 and accompanying footnotes, supra.

19. Transcript of proceedings, January 9, 2001, statement of the trial judge providing in pertinent part:

at p. 20: "... THE COURT: ... We had a divorce trial that went late one night 9, 10:00, very acrimonious, very bitter. We had another hearing in '96 very bitter...."

at p. 31: "... THE COURT: I don't feel like I need to restrict her any more and Mr. Casey for the record has set here and agreed with me. While you're arguing with the Court he's sitting there agreeing with me nodding his head saying I don't need to have my thumb on them any more. That they are doing okay. That—you know, in the past hearing these people couldn't talk. They couldn't even be around each other, but now they can. And whether like I say, whether they have grown up or just buried the hatchet these kids are doing good...."

date—an order of this Court requiring compliance [20]—had issued in *Abbott,* supra.

 ¶ 23 We are mindful that the appropriate standard of review in a custody modification is abuse of discretion.[21] Nevertheless, before we can presume the trial court's decision correct, it must be supported by the record.[22] A clear abuse of discretion occurs when a challenged decision is against or unjustified by reason and evidence.[23] Further, even where the trial court is vested with broad discretionary powers, its order will be reversed if it erred with respect to a pure, simple and unmixed question of law.[24] Here, neither the record facts nor the controlling jurisprudence support the trial court's decision.[25] Therefore, we determine that, under the facts presented—where the custodial parent is recognized as a fit repository for custody and where no real and specific harm to the children is identified, the mother may not be restricted from relocating out of state under peril of losing custody of her children pursuant to our decisions in *Kaiser v. Kaiser,* 2001 OK 30, ¶ 33, 23 P.3d 278 and *Abbott v. Abbott,* 2001 OK 31, ¶ 8, 25 P.3d 291.[26] Al-

though the custodial parent is entitled to leave the state without fear of losing her children, the non-custodial parent is entitled to a mandatory adjustment of the visitation schedule guaranteeing access to his minor children.

II.

¶ 24 **NO COMPELLING OR OVERRIDING EQUITABLE CONSIDERATIONS ARE PRESENTED TO SUPPORT AN AWARD OF APPEAL–RELATED ATTORNEY FEES.**

 ¶ 25 The mother argues that because she clearly should have prevailed in the trial court and because she has been forced to remain in Oklahoma, placing her employment in jeopardy, that the equities support an award of appeal-related attorney fees. Although the father does not specifically respond to this request, the record does not reveal a large disparity between the two individuals' annual salaries[27]—a factor which

**20.** Initially, mandate issued in *Kaiser v. Kaiser,* see note 1, supra, on May 17, 2001. However, mandate was recalled on May 21 and did not finally issue until September 21, 2001. Mandate is the order from this Court which requires a trial court's compliance with the opinion issued. *Daniel v. Daniel,* see note 21 at ¶ 12, infra. See also, *Chronic Pain Asoc., Inc. v. Bubenik,* 1994 OK 127, ¶ 12, 885 P.2d 1358; *Aaron v. Morrow,* 1935 OK 911, ¶ 11, 50 P.2d 674.

**21.** *Daniel v. Daniel,* 2001 OK 117, ¶ 21, 42 P.3d 863; *Manhart v. Manhart,* 1986 OK 12, ¶ 13, 725 P.2d 1234; *Duncan v. Duncan,* 1969 OK 7, ¶ 13, 449 P.2d 267.

**22.** *Enochs v. Martin Properties, Inc.,* 1997 OK 132, ¶ 5, 954 P.2d 124. See also, *Hamid v. Sew Original,* 1982 OK 46, ¶ 7, 645 P.2d 496.

**23.** *Pierce v. Pierce,* 39 P.3d 791, 2001 OK 97, ¶ 21; *Patel v. OMH Medical Center, Inc.,* 1999 OK 33, ¶ 20, 987 P.2d 1185; *Abel v. Tisdale,* 1980 OK 161, ¶ 20, 619 P.2d 608.

**24.** *Jones, Givens, Gotcher & Bogan, P.C. v. Berger,* 2002 OK 31, ¶ 5, 46 P.3d 698; *Bishop's Restaurants, Inc. of Tulsa v. Whomble,* 1960 OK 44, ¶ 0, 355 P.2d 560; *Nash v. Hiller,* 1963 OK 63, ¶ 0, 380 P.2d 77.

**25.** The facts here differ significantly from those presented to the Court in our recent decision involving redistricting in *Alexander v. Taylor,*

2002 OK 59, ¶ 22, 51 P.3d 1204, in which we determined that the trial court did not abuse its discretion in choosing one of several plans proffered where all parties had stipulated that the submitted plans satisfied the constitutional requirements of "one person, one vote" under art. 1, § 2, United States Constitution, and where no issues were presented with regard to statutory violations under § 2 of the Voting Rights Act, 42 U.S.C. § 1973.

**26.** Our decision negates the need to address the mother's basic constitutional freedom—the right to travel. *Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974). The fundamental right has been characterized as assertable against private interference as well as governmental action—a virtually unconditional personal right, guaranteed by the United States Constitution to all citizens. *Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 1523, 143 L.Ed.2d 689 (1999).

**27.** Transcript of proceedings, February 9, 2001, Rocky Casey, Jr.'s testimony providing in pertinent part at p. 36:
"... Q Okay. What was your gross pay for last year?
A Thirty-nine thousand.
Q That is about what you will anticipate you will receive this year?
A It varies it can probably not. I don't think I will make that this year because of the fact

may be considered in the decision to award such fees.[28]

¶ 26 Appeal-related attorney fees are recoverable if statutory authority exists for their award in the trial court.[29] Title 43 O.S.2001 § 110 provides for the award of counsel fees in divorce and subsequent related actions.[30] However, counsel fees claimed pursuant to § 110 do not depend on one's status as the prevailing party. Rather, they are awarded to the litigant who qualifies through the balancing of judicial equities[31] or when the appeal is frivolous or lacks merit.[32]

¶ 27 Most certainly, the mother would not argue that the appeal lacked merit. Although we recognize that the trial court's decision has impacted her employment decisions and thwarted plans for relocation, neither party asserts that the modification actions were brought out of anything but concern for the children. Based upon our review of the record, no compelling or overriding equitable considerations exist to support the father's payment of the mother's attorney fees incurred on appeal. Therefore, we hold that the mother is responsible for her appeal-related attorney fees.

## CONCLUSION

¶ 28 Our decisions in *Kaiser v. Kaiser*, 2001 OK 30, ¶ 33, 23 P.3d 278 and *Abbott v. Abbott*, 2001 OK 31, ¶ 8, 25 P.3d 291 make it clear that once a custodial parent makes the

decision to relocate only showings that the parent is unfit or that the move may result in real or specific harm to the children will support denial of the request. In absence of either element in the record, we hold that the mother may not be restricted from relocating out of state under peril of losing custody of her children. Although the custodial parent is entitled to leave the state without fear of losing her children, the non-custodial parent is entitled to a mandatory adjustment of the visitation schedule guaranteeing access to his minor children. Because the record does not present any compelling or overriding equitable considerations in the mother's favor, we also determine that the mother is responsible for her appeal-related attorney fees. The cause is remanded for further proceedings consistent with this opinion.

**COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT REVERSED; CAUSE REMANDED WITH INSTRUCTIONS.**

ALL JUSTICES CONCUR.

pop prices are going up, sales are down and I'm paid on commission. Other pop companies are selling pop cheaper than what we are.
Q You don't know what exactly what you will make this year?
A No.
Q Has it varied up to $40,000 in years past?
A From oh, when I started there any where from 27,000 up to 39, 40,000, yeah...."

**28.** *Abbott v. Abbott*, see note 1 at ¶ 12, supra.

**29.** *Daniel v. Daniel*, see note 21 at ¶ 24, supra; *First Community Bank of Blanchard v. Hodges*, 1995 OK 124, ¶ 13, 907 P.2d 1047.

**30.** Title 43 O.S.2001 § 110 provides in pertinent part:
"... C. Upon granting a decree of divorce or separate maintenance, the court may require

either party to pay such reasonable expenses of the other as may be just and proper under the circumstances.
D. The court may in its discretion make additional orders relating to the expenses of any such subsequent actions, including but not limited to writs of habeas corpus, brought by the parties or their attorneys, for the enforcement or modification of any interlocutory or final orders in the divorce action made for the benefit of either party or their respective attorneys."

**31.** *Stork v. Stork*, 1995 OK 61, ¶ 18, 898 P.2d 732; *Thielenhaus v. Thielenhaus*, 1995 OK 5, ¶ 19, 890 P.2d 925; *Phillips v. Phillips*, 1976 OK 165, ¶ 10, 556 P.2d 607.

**32.** Title 20 O.S.2001 § 15.1; *TRW/Reda Pump v. Brewington*, 1992 OK 31, ¶ 13, 829 P.2d 15.